139 Pa. Commonwealth Ct. 509 (1991)
591 A.2d 1146
I.A. CONSTRUCTION CORPORATION, Individually and for the Use and Benefit of H. Miniscalco & Sons, Inc. and H. Miniscalco & Sons, Inc., Petitioners,
v.
DEPARTMENT OF TRANSPORTATION, Respondent.
DEPARTMENT OF TRANSPORTATION, Petitioner,
v.
I.A. CONSTRUCTION CORPORATION, Individually and for the Use and Benefit of H. Miniscalco & Sons, Inc. and H. Miniscalco & Sons, Inc., Respondents.
Commonwealth Court of Pennsylvania.
Argued December 3, 1990.
Decided May 6, 1991.
Reargument Denied July 15, 1991.
*512 Mark F. Brancato, with him, Paul A. Logan, Powell, Trachtman, Logan & Carrle, P.C., King of Prussia, for petitioners/respondents I.A. Const. Corp. et al.
James W. Kutz, Asst. Counsel, with him, John L. Heaton, Chief Counsel, Harrisburg, for respondent/petitioner, Department of Transp.
Before DOYLE and McGINLEY, JJ., and BARRY, Senior Judge.
BARRY, Senior Judge.
I.A. Construction Corp. (I.A.), individually and on behalf of H. Miniscalco & Sons, Inc. (Miniscalco), Miniscalco, individually, and the Department of Transportation (DOT) have filed cross-appeals from an order of the Pennsylvania Board of Claims (Board) which ordered DOT to pay damages to both I.A. and Miniscalco; the damages awarded were less than the amount sought by I.A. and Miniscalco.
I.A. was the low bidder on a project to reconstruct and improve the Platt Bridge in Philadelphia. I.A. subcontracted with Miniscalco to perform work which is at issue in this litigation. Put in its simplest terms, Miniscalco was to dig a pipe trench at each of the many piers on the east side of the bridge, install an eighteen inch reinforced concrete pipe, connect that pipe to the existing box sewer owned by the City of Philadelphia and backfill the trench.
In formulating its bids, both I.A. and Miniscalco relied upon a drawing which was made a part of the contract. That drawing showed details relating to the drainage work at each of the piers. The drawing specified that the pipe would be placed on a uniform slope between each of the piers but indicated that the actual elevation of the line and the box sewer connections could vary from pier to pier. The drawing indicated that the line from the base of the piers to the box sewer was straight. Furthermore, the drawing contained no indications of any obstructions between the base of the piers and the sewer tie-in.
*513 Eighteen of the piers were located on property owned and operated by Gulf Oil Company (Gulf). As a result, the contract contained a specific provision for shut downs occasioned by an emergency at the Gulf Refinery. That provision provided, inter alia, that DOT would be responsible for costs associated with delays resulting from shut downs of the project due to emergencies at the Gulf Refinery.
In July of 1982, Miniscalco submitted a bid to I.A. for the work described above. I.A. used that bid when it formulated its own bid for the entire project. I.A. was awarded the contract which it and DOT signed on September 8, 1982.
Miniscalco mobilized at the job site in November, 1983, and began work at the end of December, 1983. Miniscalco had estimated that it would take approximately twenty days to complete its work. Almost immediately after commencing work, the first of a litany of problems arose. Excavation revealed a number of obstructions below the surface in the area where the drains were to be laid, including various utility lines and a twelve inch iron pipe. These obstructions, none of which appeared in the drawing relied upon in submitting the bids, prevented the work from being done in the anticipated manner. The result was additional labor and material costs. Before Miniscalco was able to complete the job, a right-of-way dispute between DOT and Gulf resulted in the suspension of work on the drains for more than a week. Immediately after resuming work, oil was discovered in the drain trenches, thereby requiring the suspension of all "hot" work in the area of the trenches. The source of the leak was eventually discovered and Gulf agreed to provide a pump and crew to remove the oil. Miniscalco returned to work but the pump and crew were not supplied by Gulf. During this entire period of time, a dispute arose between DOT and the City of Philadelphia concerning the connections to the box sewer. Until this dispute was resolved on March 15, 1984, Miniscalco was told by both DOT and the City not to make the connections. During this entire period, I.A. was requesting that DOT issue extra work orders to cover the unanticipated extra *514 costs. DOT refused to do so. By the end of April, 1984, Miniscalco had been able to complete less than half of the work required. Miniscalco and I.A. terminated their sub-contract in an amicable fashion. I.A. completed the work and sought extra compensation for both itself and Miniscalco.
I.A. then brought the present action and the matter was heard by the Board of Claims. The Board, after a week long hearing, issued findings of fact and conclusions of law, whereby it ordered DOT to pay I.A. and Miniscalco damages but in amounts less than they had sought. The Board subsequently amended its order to change the amounts due. Nonetheless, both I.A., in its own right and on behalf of Miniscalco, and DOT appealed to this Court.
Our scope of review is limited to determining whether the Board's factual findings are supported by substantial evidence or whether the Board committed an error of law. Department of Transportation v. Trumbull Corp., 99 Pa. Commonwealth Ct. 557, 513 A.2d 1110 (1986). In its appeal, DOT argues that the Board erred in permitting Miniscalco to maintain a direct claim against DOT and recover on that claim because Miniscalco was not a prequalified approved contractor. Miniscalco had been issued a prequalification certificate by DOT in February of 1983 but that certificate had expired six months later, approximately two months before Miniscalco began working on the project. The Board recognized that Miniscalco's prequalification certificate had lapsed but held that DOT was estopped from asserting this defense because it knew that Miniscalco was working as a subcontractor and "[a]t no time did PennDOT take any steps to prevent Miniscalco from performing work on the Project as a subcontractor, and IA and PennDOT's Central and District Offices treated and referred to Miniscalco throughout the term of the subcontract as IA's subcontractor." (Board's Finding of Fact No. 24, issued April 13, 1990). DOT argues now, as it did before the Board, that I.A. was carrying the Miniscalco employees on its payrolls which prevented DOT from knowing *515 Miniscalco's actual status. The Board, however, in its fact-finding capacity, decided that DOT did have knowledge of Miniscalco's status as a subcontractor. As this finding is supported by substantial evidence in the record, we agree with the Board's legal conclusion that DOT is estopped from now asserting that Miniscalco was not a properly qualified subcontractor.
DOT next argues that the Board erred in holding that DOT was liable for any damages. In Acchione v. Department of Transportation, 501 Pa. 337, 461 A.2d 765 (1983), the Supreme Court held that a contractor may recover where it suffers financial harm because it relied upon a material misrepresentation of the government agency. DOT argues that Acchione is not applicable because it made no misrepresentations in this case. We cannot accept DOT's argument.
DOT asserts that the drawing which shows the details of the drainage work which I.A. and Miniscalco relied upon in submitting the bid was not a representation by DOT. As already mentioned, this drawing showed that the drainage pipe would be laid in a straight line. Furthermore, the drawing contained no indication that any underground utility lines or pipes were in the vicinity of the work. Witnesses for both Miniscalco and I.A. testified that it was customary in the construction field for contractors to rely upon such drawings in submitting bids, especially with regard to the location of underground utilities. As the Board found in its findings of fact, DOT worked for over four years to formulate the plans for this project. The Board found that the contractors reasonably relied upon the drawing when they submitted bids in this case. For this same reason, we must reject DOT's assertion that I.A. and Miniscalco were responsible to locate all utility lines before beginning work.
DOT also argues that the contractors were responsible to inspect the job site before submitting bids. The contract contained provisions requiring an on-site inspection *516 prior to submitting bids. Henry Miniscalco, who was responsible for formulating Miniscalco's bid, testified that he did inspect the site. He also testified that it is not customary in the trade to do excavation to search for underground utilities, stating that chaos would result if every party interested in submitting a bid attempted to dig before submitting a bid. In this regard, the Board found:
15. The parties agree that at no time during the course of its design of the Project did PennDOT or its designer perform subsurface investigations at any of the piers where drainage work was to be performed, nor did PennDOT or its designer attempt, during the design stage, to detect the presence of pre-existing utilities, pipelines, structures, or other obstructions that may have lain in the area in which the 18-inch [drainage pipe] was to be placed. (N.T. 906).
16. Hank Miniscalco prepared Miniscalco's bid and personally inspected the site of the work in 1982 prior to bidding on the subcontract. (N.T. 462, 471).
17. Mr. Miniscalco was personally aware, at the time of the bid, that the City of Philadelphia had placed sludge lines in the year 1974 near the location of the box sewers into which the 18-inch drainage lines were to be tied, and he saw patches in the roadway near the box sewers that showed the location of the sludge lines. (N.T. 471-473).
18. Mr. Miniscalco took the existence of the sludge lines into consideration when formulating Miniscalco's bid. (N.T. 485-486).
19. No test pits or borings were made by IA or Miniscalco to determine whether there were any locations at any of the 26 piers where underground obstructions existed that might affect the timing or manner of performance of the work, and the parties agree that it would have been unreasonable for the bidders on the Project to have performed such subsurface investigations. (N.T. 52, 265-266, 472-477, 906-907).
(Board's Findings of Fact, April 13, 1990.) These findings of fact, all of which are supported by substantial evidence, *517 require us to reject DOT's argument that there can be no recovery because of the failure of I.A. or Miniscalco to perform inspections. There was, in fact, a reasonable inspection. For all of the foregoing reasons, the appeal of DOT is without merit.
In I.A.'s appeal, it argues that the Board erred in failing to apply the force account provisions of the contract in calculating the damages due. In Trumbull, a case similar to this one, we affirmed the Board's award of damages on a force account basis. The Board, however, in the present case did not feel that use of the force account provisions was "appropriate" and awarded damages on another basis. We believe that this was error.
In both Trumbull and the present case, the contracts contained the following identical provisions. Section 109.03 provided:
MODIFICATION OR ALTERATION IN CHARACTER OF WORK  The drawings and specifications herein referred to may be modified or altered at any time by the engineer in writing if such changes are necessary to update, adjust, accept, or fully complete the work contemplated by the contract.
Current and/or additional work involved in such changes will be paid for at the contract unit price. However, if such changes materially increase or decrease the unit cost of work, or if work not contained in the contract is required, payment will be made as extra work in accordance with the provisions of Section 109.04(c).
Section 109.04(c) provides:
Extra Work. Any work having no quantity and/or price included in the contract, and current or additional work requiring an adjustment in price as provided in Section 109.03, will be performed as extra work, at a price to be negotiated between the engineer and the contractor, and ordered in writing by the engineer.
If a fair and equitable unit price or lump sum cannot be determined by the engineer, or where such method of payment is impractical, the engineer will, in writing, order *518 the contractor to perform the work, as extra work on a force account basis, in accordance with the provision of Subsection (d).
In Trumbull, the Board made a factual finding that a reduction in the quantity of work caused Trumbull's costs to increase. In the present case, the Board found that work not contained in the contract was required. In both cases, DOT failed to agree on a fair and equitable price or order the work to be completed on a force account basis. In Trumbull, we held that under those circumstances, the Board was correct in calculating damages on a force account basis. As we can see no significant factual difference between the two cases, we believe that Trumbull requires the force account provisions to be used in determining damages.
DOT advances an argument that the two cases are distinguishable. In both cases, the contracts provided:
The contractor further covenants and warrants that he has had sufficient time to examine the site of the work; that he has examined the site of the work; that he has had sufficient time to examine the site of the work to determine the character of the subsurface material and conditions to be encountered; that he is fully aware and knows the character of the subsurface material and conditions to be encountered; and that he has based the within contract prices on his own independent examination and investigation of the site, subsurface materials, and conditions and has not relied on any subsurface information furnished to him by the Commonwealth of Pennsylvania, Department of Transportation.
DOT argued in Trumbull, as it does here, that this clause bars recovery. In Trumbull, we stated:
The present case is not one in which a contractor begins work and subsequently encounters subsurface conditions which increase his costs. The costs were increased as a result of the quantity of base repair which PennDOT designated. Trumbull did not rely on any representation of subsurface conditions. It relied on the estimated quantity *519 of base repair included in the contract. Furthermore, Trumbull could not attempt to examine the subsurface conditions and estimate the quantity of base repair because PennDOT provided no standards by which to determine where work would be needed. The subsurface clause does not apply.
99 Pa. Commonwealth Ct. at 561, 513 A.2d at 1113. DOT argues that, because there was reliance in the present case upon a representation concerning subsurface conditions, Trumbull does not apply. We do not agree.
We note first our prior discussion concerning the question of inspection. The Board found that it would not have been reasonable for the bidders to do subsurface investigations concerning the existence of utility lines. If the investigation purportedly required by the contract could not reasonably have been performed, those provisions cannot be used to deny recovery to a contractor. The Board in this case found that the inspection required by the contract was, in fact, performed by Henry Miniscalco. Furthermore, we believe this clause is simply not meant to apply to the question of utility lines; rather, we believe it is intended to deal with natural subsurface conditions which can be ascertained by test borings and the like. For these reasons, DOT's attempted distinction between this case and Trumbull on these grounds cannot be accepted.
We are finally left with the application of the provisions concerning force account work in determining the damages. Section 109.04(d) of the contract details how to calculate damages pursuant to the force account method. The Board, believing that these provisions were not applicable, made no specific findings on I.A.'s proof in this regard. While both parties advance arguments concerning the proper amount of damages, this question necessitates factual determinations by the Board on I.A.'s proof. It is for the Board to decide which of the costs set forth by I.A. must be considered in setting damages and to give an explanation of why any elements of the proof are being rejected. Until *520 this is done, we cannot effectively exercise our appellate review.

ORDER
NOW, May 6, 1991, the orders of the Board of Claims, dated April 13, 1990 and May 8, 1990, are affirmed insofar as they order that the Department of Transportation is liable for damages in this matter. Insofar as those orders set the amount of damages owed, the orders are vacated and the matter is remanded to the Board of Claims for proceedings deemed necessary to award damages pursuant to the force account provisions of the contract.
Jurisdiction relinquished.