**PENNSYLVANIA DEPARTMENT OF TRANSPORTATION, Petitioner,**

v.

**JAMES D. MORRISSEY, INC. For and on Behalf of W.P. DICKERSON AND SON, INC., Respondent.**

**JAMES D. MORRISSEY, INC. For and on Behalf of W.P. Dickerson and Son, Inc., Petitioner,**

v.

**PENNSYLVANIA DEPARTMENT OF TRANSPORTATION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 18, 1996.
Decided Aug. 8, 1996.

Gerald R. Schultz, for Department of Transportation.

Bert R. Oastler and Philip E. Beck, for James D. Morrissey, Inc., et al.

Before McGINLEY and FRIEDMAN, JJ., and KELTON, Senior Judge.

FRIEDMAN, Judge.

The Pennsylvania Department of Transportation (DOT) and James D. Morrissey, Inc. (Morrissey), for and on behalf of W.P. Dickerson and Son, Inc. (Dickerson), cross-appeal from an order of the Pennsylvania Board of Claims (Board) entering an award of damages in the amount of $825,000.00, plus six percent interest from September 16, 1988, in favor of Morrissey and Dickerson.[1] Each of the parties asserts that the Board did not award the proper measure of damages.

In July of 1987, DOT issued a Notice to Bidders (Notice) for a contract (Contract) calling for the construction of a 4.4 mile-long section of Interstate 476 in Delaware County, Pennsylvania (Project). (Board's Findings of Fact, Nos. 4 and 7.) The Notice was subsequently amended and supplemented by a total of five addenda, issued between July of 1987 and the Contract's December 3, 1987 bid date; these addenda became part of the bid documents and, ultimately, the Contract. (Board's Finding of Fact, No. 5.) The Project included the construction of various structures, including a number of bridges, culverts and retaining walls. (Board's Finding of Fact, No. 8.) Among the retaining walls required by the Contract were fourteen "R–Walls" of varying lengths and heights needed to widen the existing roadway along a 2.1 mile-long segment of the Project.[2]

1. The Board heard the case on May 10 and 11, 1994, and issued its Findings of Fact, Conclusions of Law, Opinion and Order on July 14, 1995. DOT filed a Petition for Review of this Order on August 10, 1995, and Dickerson filed a Petition for Review on August 23, 1995. We consolidated the two petitions by order dated August 25, 1995.

2. As of July 24, 1987, the Special Provisions portion of the Notice included the following statement with respect to the R–Walls:

> Construct Reinforced Concrete Retaining Wall or Proprietary Retaining Wall Alternate, either a re-enforced Earth Wall, Retained Earth Wall, Doublewal or Experimental Evergreen wall

(use Evergreen wall as an alternate on [the R–Walls]) meeting the requirements of the Special Provision titled "PROPRIETARY WALLS", and as herein specified.

(Board's Finding of Fact, No. 18.) The Notice listed each of the fourteen R–Walls as a separate Contract item and for each wall stated, "Construct one of the following ... Proprietary Retaining Wall [or] Reinforced Concrete Retaining Wall." (Board's Finding of Fact, No. 19.) The Special Provisions section of the Notice also contained a four-page technical description of the Evergreen wall system, subtitled "EVERGREEN WALL." (Board's Finding of Fact, No. 20.) In the Construction Drawings portion of the Notice were schematic drawings for each of the R–Walls

(Board's Findings of Fact, Nos. 9 and 11.) These R–Walls are the subject of this action.

Dickerson, a structures contractor, investigated the Project and decided to submit a subcontract bid for construction of the Project's various structures to Morrissey. Morrissey, a general contractor with whom Dickerson had previously worked, expressed an interest in the Project, and the two companies sent representatives to a pre-bid conference on August 25, 1987. During the conference, DOT did not mention any changes in the Notice requirements with respect to the R–Walls. (Board's Findings of Fact, Nos. 13, 22 and 41.)

However, on October 5, 1987, October 14, 1987 and November 24, 1987, DOT issued Addenda Nos. 2, 3 and 4 respectively,[3] so that as of the December 3, 1987 bid date, the Special Provisions portion of the amended Notice provided as follows with regard to the types of proprietary wall systems which could be used to construct the R–Walls under the Contract:

(a) Construct Reinforced Concrete Retaining Wall or Proprietary Retaining Wall Alternate, either a re-enforced Earth Wall, Retained Earth Wall, Doublewal or Experimental Evergreen wall (use Evergreen

wall as an alternate on [the R–Walls] ) meeting the requirements of the Special Provision titled "PROPRIETARY WALLS", and as herein specified.

(b) The Special Provisions section of the Notice also contained a five-page write-up, under the subheading "EVERGREEN WALL", which provided a technical description of how the Evergreen walls were to be fabricated, installed and backfilled.

(c) The schematic drawings for the R–Walls contained a note which stated:

1. Construct Reinforced Concrete Retaining Wall or Proprietary Retaining Wall or Alternate, either a Reinforced Earth Wall, Retained Earth Wall or Doublewal.

(Board's Finding of Fact, No. 34.)

On December 3, 1987, Dickerson submitted a quotation to Morrissey in the amount of $42,617,542.80 to construct the Project's structures. (Board's Finding of Fact, No. 15.) Understanding that Evergreen walls were permitted by the Contract, and having determined that Evergreen walls would be $825,000.00 less expensive than Doublewal, Dickerson based its bid to Morrissey on its plan to use Evergreen walls for the Project's fourteen R–Walls.[4] (Board's Findings of

and a note which read: "1. Permitted Proprietary Wall Types: A. DOUBLEWAL, B. EVERGREEN WALL." (Board's Finding of Fact, No. 21.)

3. Addendum No. 2 substituted a more detailed five-page technical description of Evergreen walls for the original four-page document. (Board's Finding of Fact, No. 24.) Addendum No. 2 also deleted the note which accompanied the original construction drawings, viz., "1. Permitted Proprietary Wall Types: A. DOUBLEWAL, B. EVERGREEN WALL." (Board's Finding of Fact, No. 26.)

Addendum No. 3 made no changes to the Special Provisions with respect to Evergreen walls; however, with respect to the drawings for the R–Walls, Addendum No. 3 stated, "Add Reinforced Earth to Permit[ted] Proprietary Wall Types." (Board's Findings of Fact, Nos. 28 and 29.)

Addendum No. 4 also left the Special Provisions with respect to Evergreen walls unchanged. With respect to the R–Wall drawings, this Addendum stated:

Delete changes to CONSTRUCTION DRAWINGS referenced in Addendum 2 ... and replace as follows:
. . . .

Under "NOTES" change the following note:
1. Permitted Proprietary Wall Types:
A. DOUBLEWAL B. EVERGREEN WALL to read:
1. Construct Reinforced Concrete Retaining Wall or Proprietary Retaining Wall Alternates, either a Reinforced Earth Wall, Retained Earth Wall or Doublewal.

(Board's Findings of Fact, Nos. 31 and 32.) Addendum No. 4 also deleted the note added to the R–Wall drawings by Addendum No. 3, stating, "*Delete* the following: ... Add Reinforced Earth to Permit[ted] Proprietary Wall Types." (Board's Finding of Fact, No. 33.)

4. After receiving Addendum No. 4, Dickerson questioned whether Evergreen walls were still permissible for the R–Walls and sought the advice of Tom Elmore (Elmore), an independent contractor who was an expert on retaining walls and had presented himself to Dickerson as a person who could provide a competitive estimate for the R–Walls bid. Elmore conducted an investigation whereby he had ten to fifteen conversations with four or five different responsible parties at DOT. Everyone told Elmore that Evergreen walls could be used on the Project; therefore, after eliminating the other listed options as

Fact, Nos. 16–17, 85.) Morrissey then incorporated Dickerson's bid into its own bid to DOT. (Board's Finding of Fact, No. 86.)

Morrissey was the successful bidder and, on January 13, 1988, Morrissey entered into a written contract with DOT based upon its bid; the original Contract amount was $88,-432,273.27. (Board's Findings of Fact, Nos. 88–89.) In late January, Jeff Wendel of DOT told Dickerson for the first time that Evergreen walls could *not* be used on the Project. (Board's Finding of Fact, No. 95.) This was confirmed at a February 1, 1988 pre-construction conference, at which DOT representatives told Dickerson that it would not be allowed to use the Evergreen walls as presented in the conceptual drawings submitted for DOT approval; DOT stated that the Evergreen walls had been disallowed by Addendum No. 4.[5] (Board's Finding of Fact, No. 96.)

Dickerson sought review of the matter before DOT's District Claims Review Committee (Committee), arguing that the Contract permitted use of Evergreen walls and that Dickerson would incur substantial costs if forced to use another proprietary retaining wall system. In March 1988, the Committee rejected Dickerson's request to use Evergreen walls and denied Dickerson's claim for additional funds to compensate Dickerson for the added expense of using a product other than Evergreen walls. (Board's Findings of Fact, Nos. 97–98.)

Immediately following the Committee's denial, Dickerson contacted the Atlantic Pipe Corporation (Atlantic), the only manufacturer of Doublewal units and the only authorized Doublewal supplier, directing Atlantic to begin the work necessary to timely furnish the R–Walls for the Project.[6] (Board's Findings of Fact, Nos. 99, 110.) Atlantic agreed to provide Dickerson with Doublewal for the Project; however, Atlantic would not guarantee timely delivery.[7] Nevertheless, having no other choice, Dickerson was forced to work with Atlantic. (Board's Findings of Fact, Nos. 104, 109–10, 117.) Despite being told by Dickerson to begin delivering Doublewal components in August of 1988 and to complete delivery of all R–Wall units by year's end, Atlantic delivered the first Doublewal units three and a half months later than requested and completed delivery almost a full year later than originally sched-

---

less desirable and more expensive, Elmore submitted bids to Dickerson based on using the Evergreen wall system. (Board's Findings of Fact, Nos. 35–57.)

In addition, William Warren Roemer (Roemer) of Nitterhouse Concrete Products, Inc. (Nitterhouse), the authorized licensee for Evergreen Walls, spoke with Doug May (May), Project Engineer for DOT, regarding the technical aspects of Evergreen walls. May never indicated that DOT would not allow Evergreen walls on the Project. (Board's Findings of Fact, Nos. 69–70.) Indeed, in several conversations with DOT representatives, both before and after the bid date, no employee of DOT ever indicated to Roemer that Evergreen walls could not be used on the Project or that this was even a possibility. (Board's Findings of Fact, Nos. 71–80.)

Dickerson, relying on Elmore's investigation, prepared and submitted its bid to Morrissey based on the cost of Evergreen walls, which Dickerson had determined to be $825,000.00 less expensive than Doublewal. (Board's Findings of Fact, Nos. 81–85.) In turn, Morrissey incorporated Dickerson's bid into the successful bid that Morrissey submitted to DOT. (Board's Findings of Fact, Nos. 86, 88.)

5. On February 24, 1988, Dickerson entered into a written subcontract agreement with Morrissey

in the amount of $32,885,297.52, based on Dickerson's bid. (Board's Finding of Fact, No. 90.)

6. Indeed, in an effort to expedite the matter, Dickerson had actually submitted a conditional Purchase Order for the R–Walls to Atlantic, contingent upon the Committee's rejection of Dickerson's Evergreen wall submittal. Immediately following the Committee meeting, Dickerson gave Atlantic a "Notice to Proceed" on the Purchase Order. A few days later, Dickerson set up a delivery schedule for the R–Walls and requested that Atlantic execute and return the Purchase Order. However, when Atlantic finally returned a signed Purchase Order to Dickerson on July 14, 1988, it was materially different from the Purchase Order proposed by Dickerson in that it was on Atlantic's form and included terms and conditions dictated by Atlantic. (Board's Findings of Fact, Nos. 100–02.)

7. Among the terms contained in the Purchase Order dictated by Atlantic that differed from Dickerson's Purchase Order terms, was a provision stating: "Atlantic Pipe Corporation *will attempt* to schedule shipments in accord with customer requests; *however*, no backcharges will be honored for delays in delivery which result from any cause whatsoever." (Board's Finding of Fact, No. 103, emphasis in original.)

uled.[8] (Board's Findings of Fact, Nos. 105–06, 116.) As a result, despite Dickerson's best efforts, the Project's R–Wall erection operation was inefficient and costly. (Board's Findings of Fact, Nos. 115, 118–19.)

Morrissey and Dickerson filed a claim with the Board for $1,523,124.00 in damages.[9] Of that amount, $825,000.00 represented the estimated cost of substituting the Doublewal product for the Evergreen units; the balance covered the increased costs and overhead which Morrissey and Dickerson claimed were associated with the delays in using Doublewal.[10] (Board op. at 20–21.) Concluding that the Contract's specifications regarding the R–Walls were glaringly ambiguous, and that Dickerson reasonably relied upon an investigation and DOT's own advice to use the Evergreen wall quotation in its bid to Morrissey, the Board determined that DOT breached the Contract by disallowing use of the Evergreen product after awarding the Contract. (Board's Findings of Fact, Nos. 121–24; Board's Conclusions of Law, Nos. 3–10.)

However, the Board determined that Dickerson was only entitled to damages equalling the under-bid amount of $825,000.00, plus 6% interest; the Board did not award damages for the remaining costs alleged by Dickerson as associated with the use of the Doublewal system. Citing *Taylor v. Kaufhold*, 368 Pa. 538, 84 A.2d 347 (1951), the Board stated, "When a breach in contract occurs, the party sustaining damages is entitled to recover such damages provided; 1. The damages were such as would naturally and ordinarily result from the breach. 2. They were reasonable [sic] foreseeable and within the contemplation of the parties at the time they made the contract. 3. They could be proven with reasonable certainty." (Board op. at 24.) The Board reasoned that, had Dickerson based its bid on the Doublewal system, the bid would have been $825,000.00 higher and, therefore, this difference was a natural and ordinary result of the breach. However, the Board viewed the balance of the damages claimed by Morrissey and Dickerson, i.e., those costs stemming from the Doublewal manufacturer's inability to supply its product in a timely fashion, as neither reasonably foreseeable nor within the contemplation of the parties. (Board op. at 24.) The parties cross-appealed from this decision.

On appeal to this court,[11] Morrissey and Dickerson argue that: (1) Dickerson is entitled to recover the difference between the *actual costs* reasonably incurred by Dickerson in using the Doublewal system instead of the Evergreen wall system allowed by the Contract ($1,410,300.00); and (2) Morrissey is entitled to an award equal to 8% of Dickerson's award as a general contractor mark-up

---

8. Throughout this period, Dickerson repeatedly contacted Atlantic and DOT in an effort to improve the Project schedule; however, both were unresponsive. In fact, Atlantic even charged Dickerson for Atlantic's own delays, imposing an additional 7% escalator on all materials it delivered after December 31, 1988. When Dickerson initially refused to pay the higher price, Atlantic insisted that Dickerson pay the entire purchase price for each shipment in advance, or else Atlantic would not ship any product at all. (Board's Findings of Fact, Nos. 107–09, 111–15.)

9. This action originally was docketed with the Board on September 16, 1988. In the original Complaint, Morrissey and Dickerson sought damages of $600,000; however, by agreement of the parties, an order was entered on April 20, 1989 granting an indefinite stay of proceedings. The Complaint was amended on June 8, 1992 (Amended Complaint), and again on September 21, 1993 (Second Amended Complaint). DOT filed an Answer to the Amended Complaint on August 21, 1992. The parties stipulated that DOT was not required to file an Answer to the Second Amended Complaint; rather, the Answer to the Amended Complaint and New Matter filed by DOT on August 21, 1992 was deemed applicable to the allegations in the Second Amended Complaint, with the new allegations contained therein being deemed denied by DOT.

10. Dickerson claims that it actually spent $1,410,300.00 more to construct the R–Walls using Doublewal than it would have spent if allowed to use Evergreen walls; however, because Morrissey, as general contractor, is entitled to a reasonable general contractor's markup of 8%, the correct measure of damages should include an additional $112,824.00 (8% of $1,410,300.00) as an award to Morrissey, bringing the total damages award to $1,523,124.00.

11. Our scope of review is limited to determining whether the Board's findings of fact are supported by substantial evidence, or whether the Board committed an error of law. *I.A. Construction Corp. v. Department of Transportation*, 139 Pa.Cmwlth. 509, 591 A.2d 1146 (1991).

($112,824.00). On the other hand, in its appeal,[12] DOT argues that Dickerson is entitled to only $600,000.00, plus 6% interest. DOT maintains that the record lacks substantial evidence to support the Board's finding that Dickerson underbid by $825,000.00; in fact, DOT points to evidence which shows that Dickerson only lowered that bid by $600,-000.00.[13] Thus, using the same reasoning employed by the Board, DOT contends that Dickerson only lost $600,000.00 as a natural and ordinary result of the breach, and any damages sought by Dickerson over and above this amount were neither foreseeable nor within the contemplation of the parties at the time they made the Contract.

■ In the law of contracts, remedies for breach of contract are designed to protect either a party's: (1) expectation interest, by attempting to put him in as good a position as he would have been had there been no breach; (2) reliance interest, by attempting to put him back in the position in which he would have been had the contract not been made; or (3) restitution interest, by requiring the other party to disgorge the benefit he received by returning it to the party who conferred it. *Trosky v. Civil Service Commission*, 539 Pa. 356, 652 A.2d 813 (1995) (citing Restatement (Second) of Contracts § 344, comment a). Although the parties here agree that the correct measure of damages in this case is to place Dickerson and Morrissey as nearly as possible in the same position they would have occupied had there been no breach, (DOT's brief at 10; Morrissey's brief at 18), the parties disagree as to

the amount that would achieve this goal. After consideration of both positions, we agree with Morrissey and Dickerson.

■ At the time Dickerson submitted its bid, it was aware that performing the work using Evergreen walls would cost considerably less than using Doublewal. In fact, because the Contract allowed Dickerson to use either wall system, Dickerson actually performed an analysis comparing the cost of the two systems and concluded, *based upon the information available to it at the time*, that Evergreen walls would be $825,000.00 less expensive than Doublewal. (Board's Finding of Fact, No. 85.) Dickerson elected to bid the R–Walls based on its use of the Evergreen wall system, but was forced to switch to Doublewal when DOT subsequently breached the Contract. Due to product delivery delays beyond Dickerson's control, the actual cost of using Doublewal was much greater than anticipated in December 1987 when Dickerson originally performed its cost analysis and formulated its bid.

In limiting Dickerson's recovery to the $825,000.00 cost differential *as estimated at the time of the bid*, the Board concluded that Atlantic's delivery delays, and the accompanying increased costs to Dickerson, did not stem from the ambiguity in the Contract but, rather, represented the type of unforeseeable and unanticipated contingencies for which a contractor ordinarily assumes responsibility. In reaching this conclusion, the Board noted that there was no indication that Dickerson would have submitted anything other than an

---

12. We note that DOT does not question its liability for breach of contract; rather, DOT only challenges the amount of damages for which it is being held liable. Accordingly, we affirm the Board's order with regard to DOT's liability for breach of contract, and we limit our inquiry on review to the question of whether the Board erred in determining the measure of damages due to Morrissey and Dickerson.

13. DOT points out that the Board based its $825,000.00 award on a finding that this figure represented the bid difference for the two wall systems, (Board Finding of Fact, No. 126); however, DOT contends that this finding was in error because, whereas the difference in the price quotations received by Dickerson for the two wall systems *was $825,000.00*, Dickerson actually only lowered its bid by $600,000.00, not $825,-

000.00. Indeed, DOT asserts that Dickerson's own evidence clearly shows that Dickerson originally formulated its bid premised on use of the Doublewal system and, when Dickerson decided to submit its bid to Morrissey based on Evergreen walls instead, Dickerson reduced this prior bid by $600,000.00. In fact, Dickerson's witness testified as follows:

> So the totals then came up to be 3,695,000 to do it in Doublewal and 2,870,000 to do it in Evergreen. That difference is 825,000 dollars. . . . .
>
> And he said, I am convinced. There's no question about it. You can use the Evergreen. And I said I agree with you but I said instead of cutting the 825,000, I'm going to cut 600 . . . . and he went and quoted the job.

(R.R. at 42a.)

$825,000.00 difference even if the Contract had clearly allowed only the Doublewal system and, further, the Board determined that these delivery delay costs still would have arisen had Dickerson utilized his original bid based on Doublewal. (Board op. at 24–25.) We cannot accept this reasoning.

First, we point out that if the Contract had clearly allowed only for the use of Doublewal, Dickerson would have known at the time of the bid that he would be forced to deal with a single-source supplier; therefore, he could have reflected the assumption of that risk in the bid amount.[14] (See R.R. at 210a–13a.) Because of the Contract's ambiguity, however, Dickerson reasonably believed that he could elect to use the Evergreen wall system, and he did. Thus, on December 3, 1987, the only risk that Dickerson contemplated and, therefore, the only risk for which he could be held responsible, was the risk of using Evergreen walls.

Moreover, contrary to the Board's assumption, the record indicates that the delivery delays might not have arisen if Dickerson actually had submitted his original bid based on Doublewal because, in that event, Dickerson would have begun to deal with Atlantic much sooner. The fact that Dickerson was forced by DOT's breach to deal with Atlantic at a later date negatively impacted on Atlan-

tic's delivery schedule. Indeed, when Dickerson met with Atlantic in an effort to resolve the delivery problems, Atlantic was candid in telling Dickerson that they had other contractors whose orders were in front of his and whose projects would be given precedence over this Project. (Board's Findings of Fact, Nos. 107–08.)

Thus, the Board erred both by assessing Dickerson's damages as of the December 3, 1987 bid date and by limiting those damages to the estimated difference between the costs of the Evergreen and Doublewal systems on that date. Clearly, damages do not arise until a contract is breached; in this case, DOT did not breach the Contract until some seven weeks after the bid date, after the Contract had been executed and Dickerson and its Evergreen wall supplier had begun preparing the drawings and calculations required by the Contract for review by DOT prior to installation of the walls. Accordingly, Dickerson's damages could not have been properly assessed until DOT breached the Contract. Moreover, as a result of DOT prohibiting Morrissey from using the Evergreen walls permitted under the original Contract, DOT, in effect, substituted that Contract with one requiring Morrissey to use only Doublewal. Because Atlantic was the sole supplier of Doublewal, the breach re-

---

14. In this regard, Elmore testified that the type of problems which Dickerson experienced with Atlantic are to be anticipated when a contractor is forced to deal with a single-source supplier. Elmore testified as follows:

A [Evergreen] appeared to be a pre-approved alternate. It appeared to be a good decision by the State to include it.
Q You agreed that it made sense engineering wise to consider Evergreen for this project?
A Yes, I did.... Because it was the only viable alternate to the other proprietary system, that being Doublewal, that could have met most federal guidelines that you have an alternate to a proprietary product.... And from a technical standpoint, it was—I think all contractors like to have options, so it was much better to have two.
....
Q Without belaboring it, you mentioned a few things that I'd like to follow upon briefly.
You mentioned an understanding that you have as to a preference by the Federal Highway Administration that largely funds these projects that there be some alternate, that the

contractor have some choice between wall systems.... I think our understanding is they don't care for a 100 percent sole source specified type of material. There needs to be a viable alternate.
Q What is your understanding as to why that is?
A Primarily for commercial and competitive type of reasons.
....
Q But it has been your experience when a proprietary wall manufacturer or the franchisee who is, after all, a business person, knows that they're the only game in town that [their] prices generally are going to be higher than if they're having to compete against another product?
A No, it has been very much so. It's not only price, it's delivery, it's quality of product, it's [cooperation] with the owner, it's their ability to secure their work with a bond.
It's just a whole host of things when there's competition and there's alternates there that produce a better situation for the final outcome of the project.
(R.R. at 210a–13a.)

quired that Dickerson endure whatever delivery problems and extra costs might arise as a consequence of dealing with a sole supplier.[15] DOT knew or should have known that Atlantic was the sole supplier of Doublewal, the only system it would accept under the substitute contract occasioned by its breach, and that such problems and costs are risks attendant to ordering from a sole supplier; therefore, DOT is liable for all costs of using Doublewal as a foreseeable result of Atlantic's performance.

Dickerson should be placed as nearly as possible in the same economic position he would have occupied had there been no breach. "In other words, [it] is entitled to be reimbursed for the money actually paid out and for all reasonable and proper expenses incurred on the faith of the contract." *Harman v. Chambers*, 358 Pa. 516, 521, 57 A.2d 842, 845 (1948). Based on the Contract here, Dickerson properly elected to construct the R–Walls using the Evergreen wall system; having done so, it is entitled to the benefit of that bargain. Thus, Dickerson should recover damages equal to the difference between what it *actually cost* Dickerson to construct the R–Walls using Doublewal and what it would have cost to construct the R–Walls had Dickerson been allowed to use Evergreen walls. This conclusion is particularly compelling where, as here, the Board found that Dickerson did everything it could to try to mitigate the impact of the problem. (Board's Finding of Fact, No. 119.)

■ Morrissey and Dickerson also contend that the Board's damage award, aside from being insufficient, is incorrect in that it only accounts for the damages which Dickerson, as subcontractor, would be entitled to recover, but does not include any award of damages to compensate Morrissey, as general contractor, for its own increased costs and damages. Morrissey and Dickerson maintain that Morrissey is entitled to an amount equal to eight percent (8%) of any award to Dickerson as a general contractor's mark-up for Morrissey. We agree. In fact, the evidence, unchallenged by DOT, established that this markup was very reasonably included as part of Dickerson's calculation of its actual costs. (R.R. at 99a, 160a, 474a, 560a.)

■ Dickerson is not required to prove its actual costs with mathematical certainty; rather, it need only introduce evidence which affords a sufficient basis for estimating the damages with reasonable certainty. Although guesses and speculation are not permitted, estimates which have a basis in reason are legally sufficient to support an award of damages for breach of contract. *Burly Construction Corp. v. Department of Justice*, 4 Pa.Cmwlth. 46, 284 A.2d 841 (1971). Here, Morrissey and Dickerson have presented considerable evidence to establish that the actual cost to construct the R–Walls using Doublewal was $4,642,450.00, and that a reasonable estimate of what it would have cost to construct the R–Walls using Evergreen walls was $3,233,150.00, for a difference of $1,410,300.00. Because Morrissey is entitled to a reasonable general contractor's markup of 8% of this amount, or $112,824.00, Morrissey and Dickerson claim entitlement to damages totaling $1,523,124.00. For its part, although DOT argued that Dickerson can recover only $600,000.00 of these costs, DOT did not dispute the accuracy of Dickerson's calculations of actual cost, nor did DOT pres-

---

15. The parties expend much effort discussing whether, under *Taylor v. Kaufhold*, 368 Pa. 538, 84 A.2d 347 (1951), recoverable damages in a breach of contract action must be *both* (1) a natural and ordinary result of the breach, *and* (2) reasonably foreseeable and within the contemplation of the parties at the time they made the contract, or whether it is enough that the damages are *either* (1) a natural and ordinary result of the breach, *or* (2) reasonably foreseeable and within the contemplation of the parties at the time they made the contract. We see no need to resolve this dispute because we agree with Morrissey and Dickerson that, under the facts of this case, the *actual excess costs* incurred by Dickerson in constructing the R–Walls using Doublewal satisfied *both* conditions.

Obviously, when DOT breached the Contract and disallowed Dickerson's choice to use the less expensive Evergreen wall option permitted under the Contract, the natural and ordinary result was to increase costs for Dickerson. However, it was also reasonably foreseeable that such a breach by DOT would be likely to cause expense even beyond the obvious, in that it would force Dickerson to deal with a sole-source supplier and belatedly assume all the increased risks that one might normally anticipate from a situation which places a contractor at a supplier's mercy.

ent any evidence to contradict these figures. Therefore, the evidence presented by Dickerson, unchallenged by DOT, is sufficient to establish an award of damages.

Accordingly, because these figures have been established, we do not remand for the trial court to determine the amount of damages; rather, in the interest of judicial economy, we now reverse and modify the Board's award of damages in favor of Morrissey and Dickerson, increasing it from an award of $825,00.00, with 6% interest from September 16, 1988, to an award of $1,523,124.00, representing $1,410,300.00 in actual costs and $112,824.00 as an 8% general contractor markup, with 6% interest from September 16, 1988.

### ORDER

AND NOW, this *8th* day of *August,* 1996, the order of the Pennsylvania Board of Claims, dated July 14, 1995, in favor of James D. Morrissey, Inc., for and on behalf of W.P. Dickerson and Son, Inc., and against the Commonwealth of Pennsylvania, Department of Transportation, in the amount of $825,00.00, with 6% interest from September 16, 1988, is hereby affirmed to the extent that it holds the Department of Transportation liable for the payment of damages. With regard to the amount of damages for which the Department of Transportation is liable, the order is reversed and modified, increasing the damage award to $1,523,-124.00, representing $1,410,300.00 in actual costs and $112,824.00 as an 8% general contractor markup, with 6% interest from September 16, 1988.

