**DEPARTMENT OF TRANSPORTATION,**
Petitioner,

v.

**P. DiMARCO AND COMPANY,**
**INC., Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 13, 1998.

Decided May 13, 1998.

Stephen S. Stokwitz, Assistant Counsel, Harrisburg, for petitioner.

Michael W. Winfield, Harrisburg, for respondent.

Before McGINLEY and FLAHERTY, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

The issue before this Court is whether the Commonwealth of Pennsylvania, Board of Claims (Board) erred in awarding damages to P. DiMarco and Company, Inc. (DiMarco) for additional expenses incurred by DiMarco while repairing a road for the Commonwealth of Pennsylvania, Department of Transportation (DOT). Because it did not, the order of the Board, with one modification to remedy a mistake in the calculation of damages,[1] is affirmed.

The relevant facts are as follows. DiMarco, as prime contractor, and DOT entered a contract on June 11, 1993 for the improvement of a 1.708–mile stretch of State Route 1010 (road) in Lancaster County for the sum of $677,648.35. The contract called for the project to be completed in two phases.

The phasing of the project was designed to permit two different sections of the road to be worked on at different times so that the entire stretch of the road would not have to be closed at one time. Phase I of the project was to be completed in twenty days, and Phase II in forty-three days. Liquidated damages were to be assessed against DiMarco for every day that the project extended beyond these time limits. Regarding the closure of the road to traffic during Phases I and II, the contract provided as follows:

Maintain two lanes of traffic for the life of this project with the following exceptions:

1) One lane may be maintained during working hours.

2) Close S.R. 1010 from Station 98+00 to Station 104+00 (Phase I) to through traffic for 20 calendar days.

3) Close S.R. 1010 from Station 732+00 to Station 758+64 (Phase II) to through traffic for 43 calendar days.

During the road closures of Phases I and II, the contract required DiMarco to "[m]aintain local traffic ingress and egress by use of existing or new roadways [and][p]rovide and maintain local access to and from the nearest intersecting public road or street, unless otherwise directed." Board Finding of Fact (FF) No. 76. Regarding DiMarco's plans for maintaining access for local traffic and emergency vehicles during Phases I and II, a witness for DiMarco testified as follows:

When we shut down a road ... I am responsible to allow homeowners to get to their properties. I am responsible for allowing emergency vehicles to get to their properties.... If someone has to get to their house, it is very easy. We ramp it in by the end of the day, there is a ramp. There might be some point in time during the day for an hour or so when somebody can't get into their house. If for some reason somebody is coming home from shopping and they have to get in, you build them a ramp and you get them in. If not, by the end of the day, you put a ramp there so they can come in and out at night and you go back the next day and you can proceed accordingly.... If they need access to the house, we give them access.

1. DOT argued that the Board mistakenly awarded DiMarco $90,000 for remission of liquidated damages. Both DiMarco and this Court agree that DOT is correct in this assertion. Accordingly, the Board's damage award to DiMarco is reduced by $90,000, to $466,429.00, along with interest at six percent (6%) per annum from December 6, 1993.

Despite DiMarco's assertions that the contract permitted complete road closure during Phases I and II, DOT required DiMarco to maintain one lane of traffic open *at all times*, including during Phases I and II. DOT's directive that DiMarco maintain one lane open at all times created additional expenses for which DOT did not compensate DiMarco, Board FF Nos. 79–83, and which comprise a portion of the damages claimed by DiMarco in this lawsuit.

DiMarco also incurred additional, unforeseen expenses on the project when, during Phase I, it encountered "soft spots" in the soil under the road that required additional labor and materials to remedy. DiMarco was not aware of these "soft spots" prior to bidding on the contract. DOT did not compensate DiMarco for these additional expenses, which also comprise a portion of DiMarco's claimed damages, because it considered unstable subsurface conditions to be DiMarco's responsibility based upon the following contract clause:

> The contractor further covenants and warrants that he has had sufficient time to ... examine the site of the project to determine the character of the subsurface materials and conditions to be encountered; that he is fully aware and knows of the character of the subsurface materials and conditions to be encountered....

Finally, during the hearing before the Board, DiMarco stipulated that it did not reduce its calculation of damages in order to account for forty-three incidents of cost overruns which DOT inspectors recorded in their project diaries and which DOT claimed were DiMarco's responsibility.

Following the hearing, the Board, by decision dated November 7, 1997, awarded DiMarco $556,429.00 in total damages.[2] This appeal by DOT followed.

■ On appeal,[3] DOT argues that the Board erred on three issues. First, DOT claims that the Board erred by finding it, and not DiMarco, responsible for the additional costs DiMarco incurred to remedy the "soft areas" in the soil under the road. DOT cites the contract clause, reproduced above, which states that DiMarco "covenants and warrants" that it has examined and is fully aware of the subsurface conditions of the road.

Second, DOT argues that the Board erred by ignoring the forty-three stipulations of cost overrun incidents for which DiMarco allegedly admitted responsibility yet did not deduct from its overall claim for damages.

Third, DOT asserts that the Board erred in awarding damages to DiMarco for its additional expenses incurred in keeping the one lane of the road open during Phases I and II of the project. The contract, DOT argues, clearly states that DiMarco was required to maintain one lane of traffic open at all times, and any additional expenses DiMarco incurred in doing so are therefore DiMarco's responsibility. As such, these expenses should not have been included in DiMarco's total damages.

### I. Responsibility for Subsurface Soil Conditions

As stated above, the contract states that DiMarco "covenants and warrants" that it has inspected the project site and is fully aware of all subsurface conditions. This clause, argues DOT, clearly places the financial responsibility on DiMarco for any unstable subsurface soil that DiMarco encounters on the project.

■ We disagree. In *I.A. Construction Corporation v. Department of Transportation*, 139 Pa.Cmwlth. 509, 591 A.2d 1146 (1991), a contractor incurred additional, unforeseen expenses when it encountered subsurface utility lines of which it was not aware when bidding on the project. The contract in that case contained the *identical* clause as is in the contract in the present case, and we held that the contractor was *not* responsible for the additional costs because a pre-bid investigation to discover the underground

---

2. Refer to footnote one regarding the recalculation of damages.

3. Our review is limited to determining whether the Board committed an error of law or constitutional violation and whether the Board's findings of fact are supported by substantial evidence. *Department of Transportation v. Brozzetti*, 684 A.2d 658 (Pa.Cmwlth.1996).

utility lines *could not reasonably have been performed.* We stated, "If the investigation purportedly required by the contract could not reasonably have been performed, those provisions cannot be used to deny recovery to the contractor." *Id.* 591 A.2d at 1150.

We recognize that the Court in *I.A. Construction* also stated that "[f]urthermore, we believe this clause is simply not meant to apply to the question of *utility lines;* rather, we believe it is intended to deal with *natural* subsurface conditions which can be ascertained by test borings and the like." *Id.* 591 A.2d at 1150–51. (Emphasis in original.)

Contrary to DOT's argument, however, this passage from *I.A. Construction* does not mean that, where the "covenants and warrants" clause is in a contract, the contractor is *always* liable for *all* natural subsurface conditions. To the contrary, according to *I.A. Construction,* the determining factor remains whether it was *reasonable* to expect DiMarco to dig beneath the surface of the road in order to test for subsurface "soft spots" prior to submitting its bid to DOT. And just as the Court in *I.A. Construction* found that it was not reasonable to expect the contractor to discover the subsurface utility lines, the Board here found that "[DiMarco's] pre-bid examination of the Project site would not reveal such soft spots as it would have necessitated digging up part of the roadway which would be impractical and overly burdensome." Furthermore, the Board found that "[DiMarco] was not under a duty to conduct an examination or investigation of subsurface condition[s] under the roadway prior to entering into the contract [because] a reasonable investigation concerning a job of [this] nature would not require such examination."

A witness for DiMarco testified that it would have been impractical to dig beneath the road surface prior to bidding on the project. The witness also testified that DOT made no arrangements to halt traffic in order to permit such digging. Accordingly, we conclude that there is substantial evidence supporting the Board's conclusion that pre-bid testing by DiMarco for subsurface "soft spots" would have been unreasonable. As

such, this contract clause cannot be used to deny recovery for DiMarco.

## II. DiMarco's Stipulations at the Board Hearing

During DOT's cross-examination of DiMarco's witness Jeffrey Fuchs, counsel for DOT produced a list of forty-three incidents that allegedly occurred during the project and created additional costs. The list consisted of project diary entries made by DOT inspectors.

DOT began questioning Fuchs on the first few diary entries, asking whether DiMarco deducted these items from its calculation of total damages. Fuchs testified that DiMarco did not deduct the items from its total damages.

When it became apparent that counsel for DOT planned to question Fuchs on all forty-three diary entries, DiMarco agreed to stipulate that it did not make any deductions from its total damages calculation for any of the forty-three diary entries made by the DOT project inspectors. DOT argues that DiMarco's stipulation is an *admission* by DiMarco that it was *liable* for the forty-three cost overrun incidents documented by the DOT inspectors in their project diaries. DOT also argues that the Board ignored the stipulation in reaching its final decision, and that DiMarco should not have been awarded damages for any of the forty-three incidents for which it allegedly admitted liability.

Conversely, DiMarco argues that it agreed to stipulate that it made no deductions from its total damages due to the incidents on DOT's diary entries because, after reviewing the diary entries, it determined that *no deductions were warranted.* In other words, DiMarco argues that it stipulated only that it did not make deductions for the forty-three incidents, but never stipulated or otherwise admitted that it agreed with DOT's interpretation of the forty-three alleged incidents as recorded in the DOT inspectors' diaries or that it was liable for them.

The following testimony by Fuchs, in response to a question by DOT's attorney as to why a particular incident as recorded in a DOT inspector's diary had not been deducted

from DiMarco's total expenses, is enlightening:

> The reason [that expense] does not appear as a deduction is [that] in Class I excavation that's built into the job.... And if the [DOT] diary says [that an item is] at contractor's expense, that may or may not be true. *That's what that particular [DOT] inspector is saying. But that's certainly not what DiMarco is saying....* If [those DOT diary entries were] the truth and the piece of paper that we were all going to work from, then none of us would be here, would we? (Emphasis added.)

As an example, consider stipulation No. 6. DiMarco stipulated that it did not deduct from its calculation of total damages for the "labor, material, and overhead costs resulting from inefficiencies due to its personnel not showing up for work on August 21, 1993." What DiMarco stipulated to is that it made no deduction for any such alleged incident, nothing more and nothing less. Nowhere in the record does DiMarco stipulate or otherwise admit that the alleged incident, which was recorded by a DOT inspector, ever occurred or, if it did, that DiMarco, and not DOT, was the liable party.

DiMarco's argument is persuasive for two reasons. First, DOT has not cited to any point in the record where DiMarco *admits liability* for the forty-three incidents in DOT's diary entries nor admits that the incidents occurred *as documented by the DOT inspectors.*

Second, witnesses for DiMarco independently testified to many of the incidents in the DOT inspectors' diaries, albeit from *DiMarco's perspective of what actually happened and/or which party was liable.* It simply is difficult to believe that witnesses for DiMarco would testify on Day One that "X" happened and was DOT's financial responsibility and then, on Day Two, DiMarco would stipulate that what actually happened was "Y" and that "Y" was DiMarco's financial responsibility, not DOT's. If DiMarco were to make such a stipulation, it would effectively be negating the testimony of its own witnesses and destroying most of its own case.

■ Accordingly, we conclude that the Board did not ignore the stipulations by DiMarco. Most likely, the Board simply accepted the stipulations for what they were, which was *not* an admission of liability by DiMarco.

## III. Road closures during Phases I and II

DiMarco and DOT dispute whether the contract permitted DiMarco to close the entire road (i.e., both lanes) during Phases I and II of the project. DOT argues that the contract only permitted the entire road to be closed to "through traffic" but that one lane had to remain open at all times, including Phases I and II, to local residents and emergency vehicles. DiMarco counters that the contract permitted complete closure of both lanes of the road during Phases I and II, and that it incurred additional expenses because of DOT's mandate, in violation of the contract, that one lane remain open during Phases I and II. There is no dispute that DiMarco did in fact incur additional costs because it was not allowed to completely close the road during Phases I and II. The only dispute is over what the contract allowed and, consequently, which party is responsible for the additional costs.

As reproduced above, the contract states that the road may be closed to "through traffic" for twenty days during Phase I and forty-three days during Phase II. DOT argues that "through traffic," by definition, does not include local residents driving to their homes and emergency vehicles that may need access to local residents. Thus, argues DOT, "closed to through traffic" means that the road may be closed to all traffic *except* local traffic, for which one lane of the road must remain open at all times, including during Phases I and II of the project. It is unreasonable, argues DOT, to interpret the contract in a way that would prevent local residents from getting to and from their homes.

However, the contract also states that DiMarco is required to "[m]aintain local traffic ingress and egress by use of existing roadways *or new roadways* [and][p]rovide and

maintain local access to and from the nearest intersecting public road or street...." Board FF No. 76 (Emphasis added.). Furthermore, a witness for DiMarco testified, as fully set forth above, that when a road is completely closed, temporary ramps are built in order to allow access for local residents and emergency vehicles. We interpret these ramps to be the "new roadways" contemplated in the contract for maintaining ingress and egress for local traffic.

■ Thus, there is substantial evidence to support the Board's conclusion that DOT was responsible for the additional expenses incurred by DiMarco in maintaining one lane of traffic open at all times, including during Phases I and II of the project.

### IV. Conclusion

The order of the Board is affirmed in all respects except for the calculation of DiMarco's total damages, which are reduced by $90,000.00 for a revised total of $466,429.00.

### ORDER

AND NOW, this 13th day of May, 1998, the order of the Department of Transportation, Board of Claims in the above-captioned matter is hereby affirmed in all respects except for the calculation of DiMarco's total damages, which are reduced by $90,000.00 for a revised total of $466,429.00.

