A. G. CULLEN CONSTRUCTION,
INC., Petitioner

v.

STATE SYSTEM OF HIGHER
EDUCATION, Respondent.

State System of Higher Education,
Petitioner

v.

A. G. Cullen Construction,
Inc., Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 18, 2005.
Decided March 15, 2006.

Alice B. Mitinger, Pittsburgh, for petitioner, A. G. Cullen Construction, Inc.

Thomas J. Madigan, Pittsburgh, for appellee, State System of Higher Education.

BEFORE: COLINS, President Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge SIMPSON.

This matter presents cross-appeals of A.G. Cullen Construction, Inc. (A.G. Cullen) and the Commonwealth of Pennsylvania, State System of Higher Education (State System) from a decision of the Board of Claims (Board). The parties' claims arise out of a contract for the renovation of the administration building on a state university campus. While the parties collectively raise over a dozen contentions, the primary question is whether the Board properly assigned responsibility for delays associated with completion of the project. Upon review, we affirm, but remand the matter for an award of attorney's fees on a limited issue.

## I. Background

This case arises out of a contract between A.G. Cullen and the State System for the renovation of John Sutton Hall, the administration building on the Indiana University of Pennsylvania (IUP) campus. Originally constructed in 1875, John Sutton Hall is noted as the centerpiece of the IUP campus and is valued as an historic structure. The State System selected a project architect with extensive experience in the restoration of historic buildings to design the project.

In April 2000, the State System solicited bids for the project from prime contractors. A.G. Cullen was the successful bidder for the general construction prime contract. A.G. Cullen's scope of work included the removal and replacement of 550 wood-framed windows, replacement of plumbing and heating systems, and the installation of ventilation and air-conditioning systems.

The State System issued A.G. Cullen a notice to proceed on June 1, 2000. Pursuant to the contract specifications, the scheduled project completion date was August 24, 2001.

As a result of delays, however, A.G. Cullen did not complete the project as scheduled. Rather, the project architect

issued A.G. Cullen a certificate of substantial completion on February 12, 2002. The architect also provided A.G. Cullen with a detailed punchlist of several hundred unfinished items. The State System substantially reduced its payments to A.G. Cullen pursuant to a liquidated damages clause in the contract and the estimated cost of completing the punchlist items.

A.G. Cullen subsequently filed four complaints against the State System with the Board. Through its complaints, A.G. Cullen sought damages for the following alleged breaches of the contract:

- Failure of a window manufacturer identified in the contract to provide windows that complied with design specifications;
- Failure of the contract specifications to include provisions for the abatement of lead-based paint;
- Withholding payment of the contract balance upon substantial completion and assessment of liquidated damages; and,
- Changes in A.G. Cullen's scope of work and other acts and omissions that delayed completion of the project.

In addition to contract damages, A.G. Cullen sought to recover interest, penalties and attorney's fees. Hearings ensued before the Board.

Following eight days of hearings and about 4000 pages of testimony, the Board issued a comprehensive opinion, consisting of 124 findings of fact, 37 conclusions of law and 30 pages of discussion. A summary of the Board's findings follows.

## II. Board's Opinion

### A. Factual Findings

#### 1. Windows

Pursuant to its contract, A.G. Cullen's scope of work included the removal and replacement of 550 wood-framed windows. The windows, which were original to the old building, varied widely in size and shape, and the window frames were elaborate.

The project's bid specifications identified two manufacturers to provide the required windows: Kolbe & Kolbe Millwork Company, Inc., and Weather Shield Manufacturing, Inc. Significantly, the specifications also permitted the use of other manufacturer's windows as long as the windows complied with the required specifications.

After issuance of the notice to proceed in June 2000, A.G. Cullen began negotiations with a supplier that proposed to purchase new Weather Shield windows from an authorized distributor. A.G. Cullen subsequently entered into a purchase agreement, pursuant to which the supplier agreed to furnish Weather Shield windows that complied with the contract specifications.

Based on its purchase agreement, A.G. Cullen planned to begin installation of the windows in the late summer of 2000. However, the supplier, the distributor and Weather Shield did not meet the production schedule and proved unable to provide windows that satisfied the project specifications.

A.G. Cullen continued to work with the supplier and Weather Shield to obtain conforming windows. Despite correspondence, meetings and discussions, however, Weather Shield failed to provide required shop drawings, sample windows or the actual windows. A.G. Cullen persisted in its attempts to work with Weather Shield until November 8, 2000, when it canceled its purchase agreement with the supplier.

Approximately a month later, A.G. Cullen entered into an agreement to purchase new Kolbe & Kolbe windows. Kolbe & Kolbe worked expeditiously to supply the

windows, and the windows arrived at the project site in late April 2001.

As a result of Weather Shield's failure to perform, A.G. Cullen sought a six-month extension in the scheduled project completion date and an increase in the amount due under the contract. However, the State System denied both requests.

### 2. Lead Paint Abatement

Pursuant to its contract with the State System, A.G. Cullen was required to remove and replace the wood frames of the windows. Unknown to A.G. Cullen and undisclosed in the project specifications, however, the window frames were painted with hazardous lead-based paint. Although the State System was aware of the existence of lead paint on the window frames, the project specifications did not include provisions for the abatement of lead paint. The absence of specifications concerning lead paint abatement was an oversight on the part of the State System.

Prior to bidding on the project, the State System issued a "notice to contractors" that addressed the issue of hazardous materials. The notice indicated the State System would address all "lead containing materials affected by the project." Reproduced Record (R.R.) at 1007a. Despite this notice, the State System did not provide information concerning the existence of lead paint on the window frames.

Nevertheless, in September 2000, approximately three months after the project began, the State System requested A.G. Cullen provide an estimate for the costs of performing the lead paint abatement work. Due to its realization that the contract did not provide for the removal of lead paint, the State System was prepared to pay A.G. Cullen costs reasonably incurred for lead paint abatement. Between February and April 2001, A.G. Cullen submitted written requests for payment to remove the lead paint. Ultimately, the State System denied payment for any costs associated with the lead paint abatement.

In early May 2001, A.G. Cullen's project manager learned the paint on the window frames contained hazardous levels of lead, with which A.G. Cullen would have to deal. As a result, A.G. Cullen ceased work on the window demolition portion of the project for the safety of its workers until it could implement an appropriate lead paint abatement program.

During suspension of the demolition work, A.G. Cullen arranged to train its employees to safely conduct the lead paint abatement work. Approximately a month later, A.G. Cullen resumed work with systems in place to protect its employees. A.G. Cullen incurred direct costs for implementing lead paint precautions including: training, testing and monitoring of workers, protective clothing, air-monitoring, protective enclosures, respirators and blood tests.

### 3. Liquidated Damages

The parties' contract contained a clause that permitted the State System to retain liquidated damages of $500 per day "for each and every calendar day beyond the scheduled completion date" of August 24, 2001. R.R. at 1122a. The State System considered the project substantially complete on February 12, 2002, 172 days beyond the scheduled completion date. As a result, the State System retained $86,000 in liquidated damages (172 days × $500/day = $86,000).

### 4. Contract Balance

The State System determined the renovation project was substantially complete as of February 12, 2002. When it issued the certificate, the State System made a payment representing the contract balance, less $86,000 for liquidated damages;

$245,898 for the estimated cost of completing the punchlist items and $122,949, which represented an additional 50% of the cost of completing the punchlist items as permitted under the contract.

After conducting its "substantial completion inspection," the State System prepared a punchlist, which contained more than 700 unfinished items it required A.G. Cullen to complete. Following receipt of the punchlist, A.G. Cullen sent its workers to the project site to complete the unfinished items. Disputes arose between the parties as to the degree to which A.G. Cullen already completed the items listed. In addition, A.G. Cullen claimed many of the items were beyond the scope of its contract. After the parties were unable to resolve the disputes, A.G. Cullen removed its workers from the project site in January 2002. The State System terminated the contract in April 2002, declaring A.G. Cullen in breach.

The State System used its own employees to complete the punchlist items over a period of approximately two years. It maintained a record of the time expended on each item as well as the cost of labor and materials it expended. As work on the punchlist continued, the State System made several payments to A.G. Cullen. The State System made a final payment to A.G. Cullen on March 4, 2004, withholding $145,472.40 of the contract balance in accordance with its record of costs in completing the punchlist items.

Based on these findings, the Board authored a thorough discussion addressing each of the claims raised by A.G. Cullen. Specifically, the Board considered whether the State System was liable for the delay caused by Weather Shield's failure to perform; whether A.G. Cullen was entitled to direct costs and delay-related damages for the unanticipated lead paint abatement work; whether the State System was entitled to retain liquidated damages and whether A.G. Cullen was entitled to interest, penalties and attorney's fees based upon the State System's withholding of payments.

### B. Board's Discussion

As to Weather Shield's failure to perform, the Board determined the State System was not responsible for the delay and costs occasioned by Weather Shield's failure to perform.

With regard to the lead paint abatement, the Board determined the 31–day period in which A.G. Cullen suspended work to implement its abatement program was solely the State System's responsibility. However, the Board determined, A.G. Cullen did not present sufficient evidence to establish any other periods of delay were specifically caused by the omission of lead paint abatement specifications.

As to liquidated damages, the Board noted the State System assessed liquidated damages for a period of 172 days, from the scheduled project completion date of August 24, 2001, until February 12, 2002, the date it considered the project substantially complete. However, the Board determined the project was substantially complete on January 11, 2002, when A.G. Cullen removed its employees from the project site, 140 days beyond the scheduled completion date. As such, the Board reduced the assessment of liquidated damages by 32 days. The Board also determined the State System could not retain liquidated damages for the period of delay it caused, i.e., the 31–day period in which A.G. Cullen implemented its lead paint abatement program. As a result, the Board reduced the assessment of liquidated damages by an additional 31 days. However, the Board determined A.G. Cullen did not establish any other specific periods of delay were attributable

to the State System. Thus, the Board determined the State System was entitled to retain liquidated damages for a period of 109 days, totaling $54,500 (109 days × $500/day = $54,500).

In order to determine the amount of delay-related damages associated with the lead paint abatement work, the Board relied on the testimony of Paul Cullen, Vice-President of A.G. Cullen. In performing his calculations, Cullen first identified several categories of delay costs, including costs for additional labor, supervision, selective demolition and scheduling. Cullen determined the total additional cost attributable to the delay by calculating the difference between the amount a delay category actually cost A.G. Cullen, and the amount budgeted for that category when A.G. Cullen submitted its bid. Cullen testified the total cost was $130,962.90. Based on its determination that the project was delayed 140 days beyond the scheduled completion date, the Board determined the "per day" delay cost was $935.45 ($130,962.90 total costs ÷ 140 days = $935.45). Based on its determination that the 31-day period of delay for implementation of the lead paint abatement program was solely attributable to the State System, the Board determined A.G. Cullen was entitled to $28,998.95 in delay costs (31 days × $935.45 per day = $28,998.95). Additionally, the Board determined A.G. Cullen was entitled to $63,713.75 in direct costs incurred as a result of the unanticipated lead paint abatement work.

Finally, the Board denied A.G. Cullen's request for penalties and attorney's fees. However, the Board awarded A.G. Cullen interest on payments it determined the State System improperly withheld. Both parties now appeal to this Court.

At the outset, we note, this Court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the statutory provisions controlling practice and procedure of Commonwealth agencies have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. 2 Pa.C.S. § 704.

 "It is not within the province of this Court to retry the case or to make independent factual findings and conclusions of law." *Dep't of Transp. v. Herbert R. Imbt, Inc.*, 157 Pa.Cmwlth. 573, 630 A.2d 550, 551 n. 1 (1993). To the contrary, the Board is entrusted with the duty of fact-finding, and we may neither assist nor interfere with this function. *Aloe Coal Co. v. Dep't of Transp.*, 164 Pa.Cmwlth. 453, 643 A.2d 757 (1994). The Board's role as fact-finder includes determining the credibility of witnesses and resolving conflicting evidence. *Id.* The Board's findings do not need to be supported by uncontradicted evidence, so long as they are supported by substantial evidence. *Gen. State Auth. v. Loffredo*, 16 Pa.Cmwlth. 237, 328 A.2d 886 (1974). If the Board's findings are supported by substantial evidence, they are binding on this Court. *Id.*

### III. A.G. Cullen's Appeal

In its appeal, A.G. Cullen raises four main issues. It asserts the Board erred in: determining the State System was not responsible for the costs and delays caused by Weather Shield's failure to perform; failing to award additional damages for the unanticipated lead paint abatement work; improperly assessing liquidated damages; and, denying its request for attorney's fees.

### A. Weather Shield's Failure to Perform

A.G. Cullen first asserts the Board erred in determining the State System is not

responsible for the costs and delays caused by Weather Shield's failure to perform. It argues, by identifying Weather Shield as an approved manufacturer in the contract specifications, the State System impliedly warranted Weather Shield could produce the required windows. A.G. Cullen maintains the identification of a manufacturer that proves unable to adequately perform constitutes a defect in the contract specifications for which the State System is responsible.

■ A.G. Cullen's contentions concerning the "implied warranty of adequate specifications" emanate from a line of cases beginning with the United States Supreme Court's 1918 decision in *United States v. Spearin*, 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918). In *Spearin*, the Court, speaking through Justice Brandeis, held:

> [I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by [citations omitted] where it was held that the contractor should be relieved, if he was misled by erroneous statements in the specifications. . . .

*Id.* at 136, 39 S.Ct. 59. By prescribing the character, dimensions and location of the work to be performed, the owner "import[s] a warranty that, if the specifications [a]re complied with, the [work] w[ill] be adequate." *Id.* at 137, 39 S.Ct. 59. Thus, "[w]hen the [g]overnment provides specifications directing how a contract is to be performed, the [g]overnment warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications." *Hercules, Inc. v. United States*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996).

■ Over the years, however, courts modified the "*Spearin* doctrine." *See PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745 (2000). The modern approach to *Spearin* assigns responsibility for a defective specification according to whether it is a "performance" or "design" specification. *Id.*; *see also* Kevin C. Golden & James W. Thomas, *The Spearin Doctrine: the False Dichotomy between Design and Performance Specifications*, 25 Pub. Cont. L.J. 47 (1995). "Performance" specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *Blake Constr. Co. v. United States*, 987 F.2d 743, 745 (Fed.Cir.1993).

■ "Design" specifications, on the other hand, "describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is required to follow them as one would a road map." *Id.*; *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987) (same); *see also Aircraft Gear Corp. v. Kaman Aerospace Corp.*, 856 F.Supp. 446, 452 (N.D.Ill.1994) (design specifications "set forth precise measurements, tolerances, materials, in process and finished product tests, quality control, inspection requirements, and other specific information.") "Specifications are design *when only one material or a certain composition* will enable the product to meet the performance standards expressed in the specification." *GAF Corp. v. United States*, 19 Cl.Ct. 490, 500 n. 2 (1990) (em-

phasis added) (quotation and citation omitted).

Explaining the significance of the distinction between "design" and "performance" specifications for purposes of assigning responsibility for a defective specification, the United States Court of Federal Claims recently stated:

> The government implicitly warrants *its design specifications* for a government construction contract ...
>
> It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result.
>
> If [a] court finds the cause of faulty construction to be a deficiency in a design specification the government would bear the risk, and consequently be liable for reasonable costs incurred by the plaintiff. Defective design specifications may entitle a contractor to an equitable adjustment of the contract for the reparative work required to build a satisfactory end-product.
>
> *But not all contract specifications are design specifications—some are merely performance specifications:*
>
> Design specifications explicitly state how the contract is to be performed and permit no deviations. *Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results.*
>
> *The government does not implicitly warrant performance specifications for complete accuracy or adequacy. Typical performance type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.*

*George Sollitt Constr. Co. v. United States,* 64 Fed.Cl. 229, 296–97 (2005) (emphasis added) (citations and quotations omitted).

■ In order to differentiate between design and performance specifications, courts examine the level of discretion that exists within a given specification; "discretion serves as the touchstone for assessing the extent of implied warranty and intended liability." *Conner Bros. Constr. Co., Inc. v. United States,* 65 Fed.Cl. 657, 685 (2005). A contractor claiming a particular specification is "design" rather than "performance" must establish the specification "do[es] not permit meaningful discretion ... and the defective specification [is] the cause of [the] injury." *Id.*

■ Of particular import here, the mere identification of a product or manufacturer does not create a design specification. Where a government agency identifies a particular product or manufacturer by name, but permits substitution of "an approved equal," such a specification is "performance" in nature and, as a result, carries no implied warranty. *See W.G. Yates & Sons Constr. Co. v. United States,* 53 Fed.Cl. 83 (2002); *Florida Bd. of Regents v. Mycon Corp.,* 651 So.2d 149 (Fla.Dist. Ct.App.1995). *See also* Philip L. Bruner and Patrick J. O'Connor, Jr., 3 *Bruner & O'Connor on Construction Law* § 9:93 (2005).

In rejecting A.G. Cullen's contention that the identification of Weather Shield as an approved manufacturer constituted a "design" defect for which the State System bore responsibility, the Board explained A.G. Cullen was responsible for selecting a window manufacturer that could supply

windows that complied with the contract specifications in a timely manner. The Board stated A.G. Cullen retained discretion to select a manufacturer from the list of two identified by the State System or, alternatively, to select another manufacturer that could produce substantially similar windows. By identifying Weather Shield as an available manufacturer in the specifications, the Board determined, the State System did not impliedly warrant Weather Shield would perform in an adequate manner. The Board determined A.G. Cullen possessed the right to enforce its agreement with Weather Shield by insisting on timely performance or terminating the agreement. Bd. Op. at 26–27.

■■ Based on our review of the specifications at issue here, we agree the State System is not responsible for Weather Shield's inadequate and untimely performance. More specifically, although the specifications identify two approved manufacturers, they expressly permit the use of other manufacturer's windows "with equal performance characteristics." R.R. at 1413a. Thus, A.G. Cullen was not required to use one of the two manufacturers identified; rather, it retained discretion in selecting a manufacturer.

Further, unlike typical "design" specifications, the window replacement specifications do not "describe in precise detail the materials to be employed and the manner in which the work is to be performed." *Blake Constr. Co.*, 987 F.2d at 745. Rather, the specifications merely specify the result to be obtained, i.e., replacement of the existing windows, and give the contractor discretion to determine how to obtain those results. While the specifications require that the windows installed satisfy various "performance requirements," R.R. at 1411a–12a, the contractor retains sole responsibility for the means and methods of the replacement of the windows. Con-

sequently, we discern no error from the Board's determination.

Additional support for this determination is found in the Federal Court of Claims decision in *W.G. Yates & Sons Constr. Co.* There, Yates contracted with the federal government to build an airplane hangar. One element of the project required installation of motorized cable reels. The government's specifications identified three manufacturers, but permitted use of an "approved equal." *W.G. Yates & Sons Constr. Co.*, 53 Fed.Cl. at 85. Yates elected to use one of the manufacturers identified, but the manufacturer was unable to supply the required reels. Yates filed suit against the government for the costs associated with the manufacturer's failure to perform, claiming the specifications were defective because an identified manufacturer did not perform. Rejecting this contention, the Court of Claims stated:

> The [g]overnment specifications . . . required that products be 'manufactured by one of the following *or approved equal* (for each type of reel): Appleton Electric Co.; Aero-motive; Burton Electrical Co.' Under the heading Product Options and Substitutions, the specifications stated, '[f]or Products specified by naming several products of manufacturers, or approved equal, select any one of the products or manufacturers named, *or an approved equal,* which complies with the specifications.'

> *These specifications do not require or warrant Appleton reels. [The government] suggested a manufacturer that made a reel it believed would fit the specifications. It would have accepted a substitute product, an 'approved equal.'*

> *The [g]overnment is not responsible for any representations that Appleton's distributor might have made . . . about*

*the suitability of a particular reel or its availability or price.*

*Id.* at 84–85 (emphasis added).

Here, as in *Yates,* A.G. Cullen was not required to purchase the windows from a specified manufacturer. Rather, like the specifications in *Yates,* the specifications here identified two manufacturers, but gave A.G. Cullen discretion to select another manufacturer who could provide windows "with equal performance characteristics." R.R. at 1413a. Consistent with *Yates,* we do not believe the State System bears responsibility for Weather Shield's failure to perform based solely upon its reference to Weather Shield as an approved manufacturer. Rather, as noted by the Board, "[u]nder the contract, A.G. Cullen retained discretion not only in selecting the manufacturer but also in contracting with the distributor and supplier of its choosing." Bd. Op. at 26.

Moreover, our decisions in *C.J. Langenfelder & Son, Inc. v. Dept. of Transp.,* 404 A.2d 745 (Pa.Cmwlth.1979) and *Dept. of Transp. v. W.P. Dickerson & Son, Inc.,* 400 A.2d 930 (Pa.Cmwlth.1979) relied on by A.G. Cullen, do not compel a different result. In *W.P. Dickerson,* Dickerson contracted with the Pennsylvania Department of Transportation (PennDOT) to manufacture several hundred prestressed concrete box beams according to PennDOT's design specifications. Dickerson manufactured the beams under constant supervision by a PennDOT inspection team. After delivery, PennDOT rejected several beams due to cracking. As a result, Dickerson failed to meet the contract deadline, and PennDOT withheld a substantial sum in liquidated damages. In determining PennDOT was responsible for delays caused by the defective beams, this Court stated "a contractor who performs according to detailed plans and specifications is not responsible for defects in the result." *Id.* at 932. We

noted Dickerson exercised little, if any, discretion and complied with all specifications for materials and procedures, which were monitored by PennDOT inspectors with authority to stop operations at any time. We held Dickerson fully satisfied its contractual obligation by constructing beams in accordance with PennDOT specifications and, as a result, PennDOT was responsible for the delays.

Thereafter, in *C.J. Langenfelder,* Langenfelder contracted with PennDOT to construct a large span of highway and bridges. However, defects in the concrete used on a bridge deck delayed completion of the project. Langenfelder filed a claim with the Board for costs associated with this delay, which the Board ultimately awarded. On appeal to this Court, PennDOT asserted the Board erred in holding it responsible for the delays caused by defects in the concrete. We rejected PennDOT's claim, stating:

> [T]he Board found that the concrete problem was caused by an adverse interaction between the initial brand of cement and the other add mixtures in the mix. This original mix design or formula was developed by the concrete supplier, who was chosen ... from a list of suppliers provided by [PennDOT]. *The mix design and all the ingredients used in it were tested and approved by [PennDOT]. A [PennDOT] inspector was stationed at the supplier's plant to test and approve the ingredients used in each batch. Other inspectors were stationed at the job site to inspect the concrete before it was poured. ...*

*Id.* at 751 (emphasis added). Based on these facts, we held, "[w]hen [PennDOT] seeks to exert such close control over the source, the formulation and the production of material to be used in a construction project, it cannot disclaim responsibility

for delays caused by a defect in that material." *Id.*

*C.J. Langenfelder* and *W.P. Dickerson* are distinguishable. First, unlike Penn-DOT in those cases, here the State System did not exert any control over the preparation or production of the required windows. Rather, it left these matters to the discretion of A.G. Cullen and its chosen manufacturer and supplier. Further, unlike the contractors in *C.J. Langenfelder* and *W.P. Dickerson,* who lacked discretion to deviate from PennDOT's stringent specifications, here A.G. Cullen retained discretion to determine the manner in which to comply with the specifications and to select an appropriate supplier and manufacturer. As such, A.G. Cullen's reliance on these cases is misplaced.

## B. Delay for Lead Paint Abatement

A.G. Cullen next argues the Board erred in failing to fully compensate it for the delays caused by the unanticipated lead paint abatement work it performed. A.G. Cullen contends it is entitled to delay-related damages from the date it discovered the existence of lead paint at the site until completion of its abatement work. It asserts this additional period of delay is solely attributable to the State System's omission of lead paint specifications in the contract and the State System's delays in responding to the issue.

 The government possesses a duty not to act in a way that will hinder or delay a contractor's performance. *Malone v. United States,* 849 F.2d 1441 (Fed.Cir. 1988); *SMS Data Prods. Group, Inc. v. United States,* 17 Cl.Ct. 1, 6 (1989) ("The [g]overnment has an implied obligation to refrain from willfully or negligently interfering with a contractor's performance."). The government violates this implied obligation where its action or inaction delays performance of a project thus increasing

costs. *Mega Constr. Co., Inc. v. United States,* 29 Fed.Cl. 396 (1993). When this occurs the contractor may have a claim for damages. *Id.* In order for the government to be found liable for hindrance, however, a contractor must establish the government caused the contractor a compensable injury. *See Servidone Constr. Corp. v. United States,* 931 F.2d 860 (Fed.Cir. 1991); *Boyajian v. United States,* 191 Ct. Cl. 233, 423 F.2d 1231 (1970).

In order to recover for an alleged compensable delay, a contractor must prove: (1) the extent of the delay with a reasonable degree of accuracy; (2) the delay was caused solely by the government's actions; and (3) the delay caused specific, quantifiable injury to the contractor. *Servidone Constr. Corp.* The burden of establishing these factors falls squarely upon the contractor. *Avedon Corp. v. United States,* 15 Cl.Ct. 648 (1988).

 A contractor must show the government was the "sole proximate cause" of the delay and no concurrent cause would have equally delayed the contract, regardless of the government's action or inaction. *Avedon Corp.; Merritt–Chapman & Scott Corp. v. United States,* 208 Ct.Cl. 639, 650, 528 F.2d 1392 (1976). "Only if the delay was caused *solely* by the government will the contractor be entitled to ... recovery of excess costs associated with the delay." *Weaver–Bailey Contractors, Inc. v. United States,* 19 Cl.Ct. 474, 476 (1990) (emphasis in original) (citations omitted). A "court [will] award delay damages only for the unreasonable portion of a government-caused delay." *Mega Constr. Co., Inc.,* 29 Fed. Cl. at 425 (quotation and citation omitted).

 Nevertheless, Pennsylvania law does not require proof of damages to a mathematical certainty. *Delahanty v. First Pa. Bank, N.A.,* 318 Pa.Super. 90,

464 A.2d 1243 (1983). Rather, evidence of damages may consist of probabilities and inferences as long as the amount is shown with reasonable certainty. *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324 (3rd Cir.1980). To prove damages, however, a plaintiff must present sufficient evidence for the fact-finder to make an intelligent estimation, without conjecture, of the amount to be awarded. *Delahanty.* It is incumbent on a contractor not only to quantify the damages but also to connect the alleged losses to the particular incident of delay. Thus, where each party bears responsibility for a portion of the total project delay, the plaintiff must prove how the lump sum of extra cost can be broken down and assigned to the responsible party. *Lichter v. Mellon–Stuart Co.*, 305 F.2d 216 (3rd Cir.1962); *Wunderlich Contracting Co., v. United States,* 173 Ct.Cl. 180, 351 F.2d 956 (1965).

In rejecting A.G. Cullen's claim for delay-related damages beyond the 31–day period in which it suspended work to implement the lead paint abatement program, the Board found, "[t]he record does not provide sufficient evidence for this Board to attribute specific periods of delay to the State System beyond the 31–day period pertaining to lead-based paint abatement. (N.T. 1258–1260, 1389–1390; Plaintiff Ex. 39, 99; Board Finding; F.O.F. 100–101)." Bd. Op., Finding of Fact (F.F.) No. 112. *See also* Bd. Op., Conl. of Law. No. 28 ("Except for the 31 days of delay attributable to the State System . . . this Board is without proof of a definable period of delay attributable solely to the State System.") Further, the Board determined A.G. Cullen failed to distinguish any specifically identifiable costs attributable solely to the State System beyond the 31–day period. Bd. Op. at 42, 44–45.

■ Based on our review of the record, we discern no error from the Board's determinations. More specifically, in an attempt to establish it incurred additional delay costs as a result of the State System's omission of information concerning lead paint, A.G. Cullen presented the testimony of Mr. David Thomas, its project scheduler. However, the Board did not accept his testimony on this point because it was vague. *See* R.R. at 543a–44a. Thus, Thomas could not explain how the State System caused any additional delay beyond the 31–day period in which A.G. Cullen suspended work to implement its lead paint abatement program.

In short, A.G. Cullen failed to present any clear evidence quantifying the cause or extent of delay attributable to the State System for lead paint abatement work beyond the 31 day-period awarded. Based on the lack of clear evidence, we discern no error from the Board's decision not to award additional delay-related damages for the lead paint abatement work.

### C. Liquidated Damages

A.G. Cullen next asserts the Board erred in permitting the State System to retain liquidated damages. A.G. Cullen contends, in order to recover liquidated damages, the State System was required to prove A.G. Cullen was solely responsible for the project delays. Because the State System was at least partially responsible for delays caused by Weather Shield's failure to perform and the delays associated with the lead paint abatement work, A.G. Cullen argues, an assessment of liquidated damages is not proper.

■ "Liquidated damages is a term of art originally derived from contract law; it denotes the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the

actual damage that will probably ensue from the breach, is legally recoverable ... if the breach occurs." *Pantuso Motors, Inc. v. Corestates Bank, N.A.*, 568 Pa. 601, 608, 798 A.2d 1277, 1282 (2002) (citations and quotations omitted). Further, in *Calabro v. Dep't of Aging*, 689 A.2d 347 (Pa. Cmwlth.1997), this Court explained:

> Liquidated damages as set forth within a contract compensate a party for difficult-to-prove losses, and serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. Clauses setting forth liquidated damages are enforced where they are reasonable, and fair attempts to fix just compensation for anticipated loss caused by breach of contracts....

*Id.* at 350–51 (citations and quotations omitted).

In Pennsylvania, liquidated damage clauses are universally accepted as a necessary part of the law governing construction contracts. *Sutter Corp. v. Tri–Boro Mun. Auth.*, 338 Pa.Super. 217, 487 A.2d 933 (1985). As such, parties to a contract may include a liquidated damages provision that ensures recovery in cases where computation of actual damages would be speculative. *Pantuso Motors, Inc.; Brinich v. Jencka*, 757 A.2d 388 (Pa.Super.2000). These clauses are enforceable provided, at the time the parties enter into the contract, the sum agreed to is a reasonable approximation of the expected loss rather than an unlawful penalty. *Brinich; see also* Restatement (Second) of Contracts, § 356(1) (1981) ("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss[;] [a] term fixing un-

reasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.")

As to the applicable burden of proof in a liquidated damages claim, the government has "the ultimate burden of persuasion as well the initial burden of going forward to show that the contract was not completed by the agreed contract completion date and that liquidated damages were due and owing." *PCL Constr. Servs., Inc. v. United States*, 53 Fed. Cl. 479, 484 (2002), *aff'd*, 96 Fed.Appx. 672 (Fed.Cir.2004). The government meets its initial burden by showing "the contract performance requirements were not substantially completed by the contract completion date and that the period for which the assessment was made was proper." *Id.*

Once the government satisfies its initial burden, the burden shifts to the contractor to show "any delays were excusable and that it should be relieved of all or part of the assessment." *Id.* A party asserting liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled. *Id.*

"Where one party to a contract is the cause of another's failure to perform, it cannot assert that failure against the other. It is particularly well settled that a party may not retain liquidated damages for the amount of delay caused by its own actions." *W.P. Dickerson*, 400 A.2d at 933 (citations omitted).

Here, the liquidated damages provision contained in the agreement states:

> The length of time to complete the project will be 450 days. That time will begin at the issuance of the Notice to Proceed.... Liquidated damages of $500.00 per day will be assessed for each

and every calendar day beyond the scheduled completion date.

R.R. at 1122a.

Based on this provision, the State System assessed liquidated damages of $500 per day from the scheduled project completion date of August 24, 2001, until the substantial completion inspection on February 12, 2002, a period of 172 days. However, the Board determined this assessment did not "account [for] project delays that were out of the control of A.G. Cullen or were due to the acts or omissions of the State System." Bd. Op. at 35. As such, the Board reduced the assessment of liquidated damages by 31 days, the period during which A.G. Cullen suspended work to implement its lead paint abatement program. In addition, the Board determined the project was substantially complete on January 11, 2002 rather than February 12, 2002. As such, the Board reduced the assessment of liquidated damages by an additional 32 days. Based on these reductions, the Board determined the State System was entitled to retain liquidated damages for a period of 109 days. In so doing, the Board explained:

> The evidence ... describes many instances of delay, including the multiple problems with the Weather Shield windows, the implementation of [Occupational Safety and Health Administration (OSHA)] requirements in removing lead containing materials, and the 'trade stacking' that resulted from scheduling changes. In light of our holding today, A.G. Cullen cannot attribute to the State System time lost in identifying a satisfactory window supplier. *To the extent the remaining delays were caused by either party, [A.G. Cullen] has not provided us with a method of apportioning responsibility. The State System may have contributed to the events that caused the project to run past August 24, 2001, but [A.G. Cullen] has not been able to identify any specific days during which the State System was responsible for delay . . . .*
>
> A.G. Cullen is an experienced contractor that agreed to a liquidated damage clause in a project where delay was a risk and damages were difficult to prove. A.G. Cullen has assumed the risk and is liable for the remaining liquidated damages, but only in the amount of $54,500, the result of 109 days at $500 per day . . . .

Bd. Op. at 37–38 (emphasis added) (citations omitted).

We discern no error from the Board's determinations. A.G. Cullen's assertions that the Board improperly permitted the State System to retain liquidated damages hinges on our acceptance of their prior arguments that: the State System was responsible for Weather Shield's failure to perform; and the State System caused the additional delays related to the lead paint abatement. Indeed, A.G. Cullen acknowledges this point in its brief. *See* Pet.'s Br. at 42. As explained above, however, we agree A.G. Cullen did not establish any additional periods of delay were attributable to the State System's conduct. As a result, we discern no error from the assessment of liquidated damages for the 109–period permitted by the Board.

■ A.G. Cullen also makes a brief conclusory jab that the liquidated damages clause here constitutes an unenforceable penalty. It does not, however, clearly explain the foundation for this statement. Nevertheless, we believe this assertion lacks merit. "In determining whether a liquidated damages clause is an unenforceable penalty, one must examine the entire contract in light of its text, what it is about, the parties' intentions, and the facility of measuring damages or lack thereof,

so as to arrive at an equitable conclusion." *Dep't of Transp. v. Interstate Contractors Supply Co.*, 130 Pa.Cmwlth. 334, 568 A.2d 294, 295 (1990); *see also RCN Telecom Servs. of Phila., Inc. v. Newtown Twp.*, 848 A.2d 1108, 1116 (Pa.Cmwlth.2004).

■■■ Here, it is beyond dispute that delay damages in the complex construction context of this case would be difficult to prove accurately. Given the extent of the work involved in the project and the fact A.G. Cullen's contract to perform the renovation work exceeded three million dollars, we do not believe $500 per day liquidated damages bears an unreasonable relation to the damages that might be expected to result from a breach. Moreover, A.G. Cullen is an experienced contractor, which dealt with the State System at arms length. The record reveals its officers understood the contract. Under these circumstances, we do not believe the liquidated damages provision at issue here constitutes an unenforceable penalty. *See Interstate Contractors Supply Co.; Sutter Corp.*

### D. Attorney's Fees

As a final issue, A.G. Cullen asserts the Board erred in denying its request for attorney's fees under the Commonwealth Procurement Code (Procurement Code), 62 Pa.C.S. §§ 101–4509. It argues an award of attorney's fees is appropriate here based on the fact the State System arbitrarily withheld payments due on the contract after A.G. Cullen substantially completed its work.

■■■ Tribunals possess great latitude and discretion in awarding attorney's fees when authorized by statute. *Cummins v. Atlas R.R. Constr. Co.*, 814 A.2d 742 (Pa.Super.2002). Generally, "[t]he denial of a request for attorney's fees is a matter within the sound discretion of the trial court, which will be reversed on appeal

only for a clear abuse of that discretion." *Hart v. O'Malley*, 781 A.2d 1211, 1216 (Pa.Super.2001); *Twp. of L. Merion v. QED, Inc.*, 762 A.2d 779, 781 (Pa.Cmwlth. 2000).

Section 3935(b) of the Procurement Code, which permits an award of attorney's fees, provides, in pertinent part:

> **Attorney fees.**—Notwithstanding any agreement to the contrary, the prevailing party in any proceeding to recover any payment ... *may* be awarded a reasonable attorney fee ... *if it is determined that the government agency ... acted in bad faith. An amount shall be deemed to have been withheld in bad faith to the extent that the withholding was arbitrary or vexatious.*

62 Pa.C.S. § 3935(b) (emphasis added).

Recognizing the terms "arbitrary" and "vexatious" are not defined by the Procurement Code, our Superior Court explained:

> [A]bsent a definition in a statute, statutes are presumed to employ words in their popular and plain everyday sense, and popular meanings of such words must prevail. Moreover, this Court has previously referred to Webster's Dictionary to determine the popular meaning of an undefined word in a statute. Webster's Dictionary defines 'arbitrary' as 'determined by impulse or whim' and 'vexatious' as 'causing or creating vexation' which is then defined as 'a source of annoyance or irritation.' Webster's II New College Dictionary 57, 1229 (2001).

Pennsylvania courts have utilized these definitions in their interpretation of other statutes authorizing the recovery of attorneys' fees based upon findings of 'arbitrary' and 'vexatious' behavior. In a decision upholding an award of attorney's fees pursuant to 42 Pa.C.S.A.

§ 2503 for the arbitrary and vexatious initiation of suit, the Pennsylvania Supreme Court defined 'arbitrary' as 'based on random or convenient selection or choice rather that on reason or nature.' *Thunberg v. Strause,* 545 Pa. 607, 682 A.2d 295, 299 (1996) (citation omitted.) The Court referred to Black's Law Dictionary when it defined a lawsuit 'vexatiously' filed if filed 'without sufficient ground in either law or in fact and if the suit served the sole purpose of causing annoyance.' *Id.* Finally, the Court defined a 'bad faith lawsuit' as one filed 'for purposes of fraud, dishonesty, or corruption.' *Id.* (citations omitted) . . .

*Cummins,* 814 A.2d at 747 (citations and quotations omitted).

Here, in denying A.G. Cullen's request for attorney's fees, the Board explained:

An award of . . . attorneys' fees is permitted where payment has been withheld in bad faith, or is arbitrary and vexatious. *A.G. Cullen has not established that the State System's actions in withholding payment were done in bad faith so as to warrant an award of . . . attorneys' fees. . . .*

Concl. of Law No. 29 (emphasis added) (citation omitted).

 We discern no error from the Board's denial of attorney's fees based on the State System's alleged improper withholding of payments due under the contract. As to the timing of payments due under the contract, the agreement states (with emphasis added):

The *[State] System shall make a payment in full within 45 days . . . less only one and one-half times the amount required to complete any then-remaining uncompleted minor items,* which amount shall be certified by the design professional and, upon receipt by the [State] System of any guarantee bonds which may be required, in accordance with the contract, to ensure proper workmanship for a designated period of time. The certificate of substantial completion given by the design professional shall list in detail each uncompleted item and a reasonable cost of completion. *Final payment on any amount withheld for the completion of minor items shall be paid upon completion of the uncompleted items listed in the certificate of substantial completion of the design professional.*

R.R. at 1056a.

Here, at the time it issued the certificate of substantial completion, the State System made a payment to A.G. Cullen representing the contract balance less $368,847.00, which represented one-and-one-half times the cost of completing the punchlist items. R.R. at 856a–58a; 3885a. Pursuant to the terms of the contract, the State System was not required to tender final payment *until the unfinished items were completed.* R.R. at 1056a. Although not required to do so, the State System made additional payments to A.G. Cullen during the period in which it used its own employees to complete the unfinished items. F.F. No. 93. As the State System complied with the language of the contract concerning the timing of payments, we agree it did not act in bad faith in withholding payments.

 However, A.G. Cullen further maintains the State System's conduct, in failing to respond to A.G. Cullen's repeated requests for payment to perform the unforeseen lead paint abatement work, warrants an award of attorney's fees. We agree.

 As noted, vexatious conduct is that which is committed without sufficient ground in either law or in fact and with the purpose of causing annoyance. *Thunberg.*

Here, the Board's findings support a legal conclusion that the State System's actions, in denying A.G. Cullen's requests for payment to perform lead paint abatement work outside the scope of its contract, constitute vexatious conduct. More specifically, the Board determined the State System knew of the existence of lead paint at the project site, but did not include provisions relating to lead paint abatement work in the contract specifications and did not subsequently address the issue despite a promise to do so in its notice to contractors. F.F. Nos. 27, 35. The Board further determined, after the State System requested A.G. Cullen perform the abatement work and requested estimates, it did not respond to A.G. Cullen's proposals for several months and ultimately denied payment. F.F. Nos. 43–48. The Board found the State System was "slow in responding to communications from A.G. Cullen regarding the lead-based paint issue and unhelpful in finding a resolution to this unanticipated matter." F.F. No. 106. Based on the Board's findings, we conclude the State System's denial of A.G. Cullen's requests for payment to perform lead paint abatement work outside the scope of its contract was vexatious. *See Thunberg.* Therefore, we will remand for an award of attorney's fees, limited to A.G. Cullen's claim for the unanticipated lead paint abatement work.

## V. State System's Appeal

In its appeal, the State System presents two main issues for our review. First, it argues the Board erred in denying its motion to supplement the record to introduce a settlement agreement and release entered into in a separate, but related, action involving A.G. Cullen's claims against Weather Shield Manufacturing, Inc., its supplier, Cooper Trading, Inc., and its distributor, McClure Johnson Company. Second, it contends the Board erred in awarding A.G. Cullen any delay-related damages and/or costs related to the lead paint abatement work it performed.

## A. Settlement Agreement and Release

The State System first argues the Board erred in denying its motion to supplement the record to present "after-discovered" evidence. Specifically, it contends, the Board erred in rejecting its request to introduce a settlement agreement and release entered into in a separate action involving A.G. Cullen's claims against Weather Shield, Cooper Trading and McClure Johnston. Pursuant to this agreement, the State System asserts, A.G. Cullen agreed to release *all* claims arising from the renovation project, including its claims against the State System.[1]

Prior to filing its claims against the State System, A.G. Cullen filed a breach of contract in the Court of Common Pleas of Allegheny County (trial court) against Cooper Trading. In turn, Cooper Trading joined McClure Johnston and Weather Shield as additional defendants. The parties to the trial court action entered into settlement negotiations in early 2004. A few months later, after the conclusion of the Board's hearings in this matter, the parties executed a settlement agreement and mutual release.

---

1. In addition to asserting the release bars all claims arising out of the project, as an alternative argument the State System contends the agreement is a release of all claims relating to the window portion of the project. In its brief, however, the State System states, if we determine the State System is not responsible for Weather Shield's failure to perform we need not address this alternative argument. Because we agree the State System is not responsible for the costs and delays associated with Weather Shield's failure to perform, we need not address this alternative argument.

After obtaining a copy of the settlement agreement, the State System filed a motion to supplement the record seeking to introduce the agreement into evidence before the Board. R.R. at 192a–95a. In seeking to introduce this agreement, the State System relied on a provision of the agreement, which states:

> The parties hereby mutually release, quit, and forever discharge each other ... and any and all other persons, firms, or corporations liable or who might be claimed liable, none of whom admit any liability, but all expressly deny liability from any and all claims ... which they may have had, have now, or may have in the future, arising out of the Project, whether known or unknown, upon final execution of this Agreement.

R.R. at 198a. Before the Board, the State System asserted this broad language barred A.G. Cullen's claims against it and, as a result, the Board should reopen the record to admit the settlement agreement and release.

The Board rejected this request, stating, when read as a whole, it was unclear the release applied to any parties or claims except those at issue in A.G. Cullen's suit against Cooper Trading. As a result, the Board determined admission of the release was unlikely to compel a different result.

■■■■■■ We review the denial of a request to present after-discovered evidence for an abuse of discretion. *Pawk v. Dep't of Envtl. Res.*, 39 Pa.Cmwlth. 457, 395 A.2d 692 (1978). "It is long settled that a petition to re-open judgment ... on the basis of after-discovered evidence, will only be granted where that evidence: (1) is new;

(2) could not have been obtained at trial in the exercise of due diligence; (3) *is relevant* and non-cumulative; (4) is not for the purposes of impeachment; (5) and *must be likely to compel a different result.*" *In re Cook,* 107 Pa.Cmwlth. 207, 527 A.2d 1115, 1116 (1987) (emphasis added). Upon review of applicable law and the record in this matter, we discern no abuse of discretion from the Board's denial of the State System's request.

■■■■■■ Under Pennsylvania law, written releases are interpreted in accordance with the rules of contract construction. *See, e.g., Davis ex rel. Davis v. Gov't Employees Ins. Co.,* 775 A.2d 871 (Pa.Super.2001). The effect of a release is determined by the ordinary meaning of its language, *Republic Ins. Co. v. Paul Davis Sys. of Pittsburgh S., Inc.,* 543 Pa. 186, 670 A.2d 614 (1995), unless a different meaning was clearly intended. *Brosius v. Lewisburg Craft Fair,* 557 A.2d 27 (Pa.Super.1989) .

■■■■■■ In construing a release, the foremost consideration is the intent of the parties. *Bickings v. Bethlehem Lukens Plate,* 82 F.Supp.2d 402 (E.D.Pa.2000); *Flatley v. Penman,* 429 Pa.Super. 517, 632 A.2d 1342 (1993). The intention of the parties is gathered from the language of the release and the circumstances surrounding its execution. *See, e.g., Wenger v. Ziegler,* 424 Pa. 268, 226 A.2d 653 (1967).

■■■■■■ In determining the parties' intent, a court must first look to the language of the release. *Bickings.*[2] The language must be viewed in the context of the entire document. *Harrity v. Med. Coll. of*

---

**2.** If a release is unclear on its face, a court must inquire into the circumstances surrounding its execution. *Int'l Org. Master, Mates & Pilots of Am. Local No. 2 v. Int'l Org. Masters, Mates & Pilots of Am. Inc.,* 497 Pa. 102, 439 A.2d 621 (1981). The surrounding circumstances clarify the intention of the parties and identify "matters which may be fairly said to have been within the contemplation of the parties when the release was given." *Vaughn v. Didizian,* 436 Pa.Super. 436, 648 A.2d 38, 40 (1994).

*Pa. Hosp.*, 439 Pa.Super. 10, 653 A.2d 5 (.1994). Each part of a release must be given effect. *Id.* Therefore, terms in one section should not be interpreted to nullify or conflict with other terms. *Flatley.* If one clause appears to conflict with another, the clauses should be construed, if possible, as consistent with one another. *Id.*

■ In addition, "[w]hen interpreting contract language, specific provisions ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject." *Eighth North–Val, Inc. v. Parkinson Pension Trust,* 773 A.2d 1248, 1255 (Pa.Super.2001). Thus, "where specific or exact terms seem to conflict with broader or more general terms, the former is more likely to express the meaning of the parties with respect to the situation than the general language." *PBS Coal, Inc. v. Hardhat Mining, Inc.,* 429 Pa.Super. 372, 632 A.2d 903, 906 (1993).

■ Only those matters within the contemplation of the parties will be covered by the release. *Farrell v. Lechman-ik, Inc.,* 417 Pa.Super. 172, 611 A.2d 1322 (1992). However, a party cannot evade the clear language of a release by asserting he did not subjectively intend to release the claim in question. *Buttermore v. Aliquippa Hosp.,* 522 Pa. 325, 561 A.2d 733 (1989). A release that bars unknown claims will be enforced, even if a party claims it was unaware of the matter at the time it executed the release. *Id.*; *Bickings.* Nevertheless, a court may not employ a "rigid literalness" in construing the release to create a contract for the parties that is contrary to their intent. *Farrell,* 611 A.2d at 1323.

■ When read in its entirety, we do not believe the release entered into be-

tween A.G. Cullen, Cooper Trading, McClure Johnston and Weather Shield evidences an intent to release A.G. Cullen's claims against the State System. Contrary to the general language relied on by the State System, the release also contains specific language that demonstrates an intent to limit its effect to the parties and claims at issue in A.G. Cullen's suit against Cooper Trading. More particularly, the first paragraph of the release contains the following specific language:

> The general release and discharge of any and all claims ... which [A.G.] Cullen may have against Cooper [Trading], McClure [Johnston] and/or Weather Shield, including, but not limited to, (1) those claims which have resulted or may in the future develop from and/or arise out of a Purchase Agreement between A.G. Cullen and Cooper [Trading] ... for furnishing of Weather Shield windows as set forth in detail by said Purchase Agreement, (2) any and all acts and/or omissions, or damages alleged by [A.G.] Cullen in the Lawsuit,[3] and (3) any and all claims against Cooper [Trading], McClure [Johnston] and/or Weather Shield in connection with the window portion of the Project.

R.R. at 197a–98a. Identical language appears in the second paragraph of the agreement, immediately after the general language cited by the State System. R.R. at 198a. As recognized by the Board,

> Taken as a whole, the [r]elease is, at best, ambiguous. The document is specific in identifying the parties to the [trial] court case and the claims among them. *The first, penultimate and most prominent clauses evidence a purpose to settle matters relating to the contractual relations these parties [were] litigating*

---

**3.** The agreement defines the "Lawsuit" as the suit between A.G. Cullen, Cooper Trading,

McClure Johnston and Weather Shield filed in the trial court. R.R. at 196a–97a.

*in the [trial court]. ... Read in the
context of the entire agreement, the
clause releasing all parties from all
claims by A.G. Cullen not only is incon-
sistent with the intentions expressed in
other sections of the agreement but also
renders the specific clauses superfluous.*

*...*

Bd. Op. at 4–5 (footnote omitted) (empha-
sis added). We agree with the Board that,
when read in its entirety, the agreement
does not clearly preclude A.G. Cullen's
claims against the State System. To the
contrary, the repeated, specific language
set forth in the agreement evidences the
parties' intent to limit its effect to the
parties and claims in the trial court action.

In addition, as the Board explained that
no evidence supported a finding that the
State System was an intended third-party
beneficiary of the release. In fact, the
circumstances apparent from the face of
the release, including the timing of its
execution, supported a contrary inference.
Bd. Op. at 5–6.

We concur with the Board's analysis.
Because the agreement does not evidence
a clear intent to release A.G. Cullen's
claims against the State System, we agree
it is unlikely to compel a different result.
As such, we discern no abuse of discretion
from the Board's denial of the State Sys-
tem's motion to supplement the record.[4]

### B. Lead Paint Abatement

The State System also advances numer-
ous arguments in support of its general
assertion that the Board erred in awarding

A.G. Cullen costs and delay-related dam-
ages as a result of the lead paint abate-
ment work.

### 1. Unforeseen Conditions Clause

The State System first contends the
Board erred in determining the presence
of lead paint at the project site was a
compensable, unforeseen condition under
the "unforeseen conditions" clause of the
contract. That clause states:

If conditions are encountered at the
site which are (1) subsurface or other-
wise concealed physical conditions which
differ materially from those indicated in
the [c]ontract [d]ocuments or (2) un-
known physical conditions of an unusual
nature, which differ materially from
those ordinarily found to exist and gen-
erally recognized as inherent in con-
struction activities *of the character pro-
vided for in the [c]ontract [c]ocuments,*
then notice by the [c]ontractor shall be
given to the [State] System promptly
before conditions are disturbed and in
no event later than 21 days after first
observance of the conditions.

R.R. at 1050a.

The State System asserts A.G. Cullen
did not establish the presence of lead paint
at the project site was "unforeseen" within
the meaning of the first prong of this
provision. It argues a contractor seeking
recovery for "differing site conditions"
must show the contracting agency made a
positive representation in its work specifi-
cations. Because the specifications here
are silent on the subject of lead paint, the

---

**4.** Nevertheless, the State System argues the
Board erred in determining the intent of the
parties to the settlement agreement without
first conducting an evidentiary hearing. It
asserts, in determining the parties' intent, the
Board improperly relied on "the unverified
and untested assertions" made by A.G. Cul-
len's counsel in its brief in opposition to the
State System's request to supplement the rec-

ord. Contrary to the State System's asser-
tions, the Board did not rely on counsel's
statements; rather, the Board construed the
release based on its plain language. Because
the interpretation of a release presents a ques-
tion of law for a tribunal, *Dep't of Transp. v.
Pa. Indus. for the Blind & Handicapped,* 886
A.2d 706 (Pa.Cmwlth.2005), an evidentiary
hearing was unnecessary.

presence of lead paint at the site could not possibly differ from any condition specified in the contract. In the absence of a positive statement that lead containing materials would *not* be found at the site, the State System asserts, the costs incurred as a result of the lead paint abatement work are not recoverable under the first prong.

 A contractor seeking recovery for work performed as a result of site conditions that differ from specified conditions must show, among other things, the contracting agency made a positive representation of work specifications. *See Thomas M. Durkin & Sons, Inc. v. Dep't of Transp.*, 742 A.2d 233 (Pa.Cmwlth.1999). A government contracting agency is liable for damages suffered by a contractor where it reasonably relies on a material misrepresentation by a government agency. *Acchione & Canuso, Inc. v. Dep't of Transp.*, 501 Pa. 337, 461 A.2d 765 (1983); *see also Thomas M. Durkin & Sons, Inc.; I.A. Constr. Corp. v. Dep't of Transp.*, 139 Pa.Cmwlth. 509, 591 A.2d 1146 (1991). The government agency need not possess actual knowledge of the misrepresentation in order for the contractor to recover. *Acchione & Canuso, Inc.* Rather, it is sufficient to show the information conveyed by the government agency was false or misleading, whether it was mistakenly so or due to arbitrary action or intentional subterfuge. *Id.*

 Here, the Board's findings and determinations support the conclusion that the presence of lead paint at the project site is compensable under the "differing site conditions" prong. Specifically, the Board determined, although the State System was aware of the existence of lead paint at the project site, the contract speci-

fications contained no reference to lead paint or any other lead containing material. F.F. Nos. 27, 35, 39. However, although the contract did not address the issue of lead paint abatement, the Board determined, the State System issued a "notice to contractors" on February 18, 2000, which states: "All asbestos and lead containing materials affected by the project will be addressed." F.F. No. 38; R.R. at 1007a. Based on this "notice to contractors," the Board stated:

> *A.G. Cullen reasonably relied on this positive statement to mean, at the least, that the contract specifications were intentionally silent on the subject of lead, and provisions for any required abatement would be drawn up later.* In spite of this statement, when A.G. Cullen encountered lead containing material, the State System did not address it and A.G. Cullen found it could not proceed with its project until it had itself abated the lead. A.G. Cullen performed this work even though its contract did not specify lead based paint abatement and it had not anticipated this additional cost.
>
> In the present case, the State System knew of the lead based paint problem and had previously included its remediation in contract specifications but simply failed to incorporate those terms in A.G. Cullen's contract, possibly inadvertently due to an oversight. This compelling evidence is more than sufficient to demonstrate, under the contract, an unforeseen condition for which A.G. Cullen is entitled to recover.

Bd. Op. at 31–32 (citations omitted). We discern no error from the Board's analysis.[5] Based on these determinations, the Board correctly concluded A.G. Cullen's

**5.** Because of our determination that the lead paint abatement work A.G. Cullen performed is compensable under the first prong of the unforeseen conditions clause, we need not address the State System's alternative argument that the work is not recoverable under the second prong.

work in abating the lead paint was in addition to its contractual obligations and it is entitled to compensation. Indeed, "[t]he law is clear that a contractor who performs work beyond the scope of its contract is entitled to additional compensation." *Dep't of Transp. v. Gramar Constr. Co.*, 71 Pa.Cmwlth. 481, 454 A.2d 1205, 1207 (983); *see also Dep't of Transp. v. Paoli Constr. Co.*, 35 Pa.Cmwlth. 390, 386 A.2d 173, 175 (1978).

Nevertheless, the State System argues the Board's determination concerning the amount of direct costs A.G. Cullen incurred in performing the lead paint abatement is not supported by substantial evidence.

■ With regard to the direct costs A.G. Cullen incurred to implement the lead paint abatement program, the Board found A.G. Cullen arranged to train its workers to conduct lead paint abatement and to work safely in a zone permeated with airborne hazardous material. F.F. Nos. 52. The Board further found A.G. Cullen was required to provide its workers with respirators, protective clothing, air-monitoring, protective enclosures, and blood tests to determine exposure to lead containing material. F.F. No. 54. As a result, the Board found:

> 56. The total cost of performing the lead-based paint abatement was determined by each worker contemporaneously recording the time attributable to lead-based paint abatement, from which information a report was ultimately generated. That report, plus the cost of specific materials, provided the information from which A.G. Cullen determined its total costs. (N.T. 1298–1301, 1302–1304; Plaintiff Ex. 167)
>
> 57. The total cost to A.G. Cullen for lead-based paint removal, based on the contemporaneous report, was $63,713.75. (N.T. 1299, 1140–1142; Plaintiff Ex. 167)

F.F. Nos. 56, 57. Contrary to the State System's assertions, the Board's findings concerning the amount of direct costs A.G. Cullen incurred are, in fact, supported by substantial evidence. R.R. at 756a; 2602a–2735a. Therefore, the State System's argument fails.

### 2. Expert Testimony

The State System next contends the Board erred in awarding delay-related damages because A.G. Cullen did not present expert testimony concerning the cause and extent of the delay. Rather, it argues, the Board improperly allowed expert opinion testimony on these issues by a lay witness, David Thomas, A.G. Cullen's "in-house scheduler."

■ Before the Board, the State System sought to exclude Thomas' testimony concerning the cause and extent of the project delays. It asserted such testimony constituted expert opinion testimony under Pennsylvania Rule of Evidence 702, and Thomas was a lay witness who was not qualified to offer such testimony. The Board denied the State System's motion, concluding Thomas' lay opinion testimony would assist it in understanding a fact in issue and did not require specialized knowledge. *See* Pa. R.E. 701.

Pennsylvania Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness, helpful to a clear understanding of the witness, testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa. R.E. 701. This Rule contemplates admission of·lay opinions rationally based on personal knowledge that are helpful to the trier of fact. *Gibson v. Workers' Comp. Appeal Bd. (Armco Stainless & Alloy Prods.)*, 580 Pa. 470, 861 A.2d 938 (2004). Lay witnesses are permitted to express opinions on a varied range of topics, including physical characteristics, physical condition or appearance, mental and emotional states, sobriety and competency and sanity. *See* Edward D. Ohlbaum, *Ohlbaum on the Pennsylvania Rules of Evidence*, § 701.09 at 479 (2005–2006 ed.). However, expert testimony is required where the subject matter involves special skill and training beyond the knowledge of a layman. *Vrabel v. Dep't of Transp.*, 844 A.2d 595 (Pa.Cmwlth.2004).

 Here, even if we agree with the State System that the Board erred in admitting Thomas' testimony as lay opinion testimony, the admission of this testimony would not constitute reversible error. More specifically, in determining the cause and extent of the delays occasioned by·the lead paint abatement work, the Board did not rely exclusively on Thomas' testimony. Rather, in addition to Thomas' testimony, A.G. Cullen presented the testimony of Paul Cullen, its Vice President, to establish the cause and extent of delay occasioned by the lead paint abatement work. In awarding delay-related damages for the 31–day period at issue, the Board relied on Cullen's credible testimony. *See* F.F. Nos.

113–120; Bd. Op. at 43. The State System does not challenge the admissibility of Cullen's testimony here. As a result, even if we agreed with the State System that the Board erred in admitting Thomas' testimony, any error is harmless.[6]·

### 3. Implementation of Abatement Program

The State System also argues A.G. Cullen is not entitled to delay-related damages as the record reveals the delays associated with the lead paint abatement were caused by A.G. Cullen's failure to timely prepare an appropriate worker protection plan. The Board's findings belie this assertion.

As noted above, the Board determined the State System was aware of the existence of lead paint at the project site, but did not include provisions for lead paint abatement in the contract specifications. F.F. Nos. 27, 35. The Board further determined, after the State System requested A.G. Cullen perform the abatement work and requested estimates, it did not respond to A.G. Cullen's proposals for several months, and ultimately denied payment. F.F. Nos. 43–48. The Board determined the State System was "slow in responding to communications from A.G. Cullen regarding the lead-based paint issue and unhelpful in finding a resolution to this unanticipated matter." F.F. No. 106. In addition, the Board determined, despite

6. In any event, we note that, based on his extensive construction experience, Thomas would likely qualify as an expert witness. An expert witness is a person who possesses knowledge not within the ordinary reach and who, because of·this knowledge is specially qualified to speak upon a particular subject. *Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 588 A.2d 1 (1991). It is not necessary the witness possess all the knowledge in his special field of activity. *Id.* However, the witness must have a reasonable pretension to specialized knowledge on the subject under investigation. *Id.* Here, the record reveals Thomas possesses over 30 years experience in the construction industry and several years of experience in the area of construction project scheduling. R.R. at 383a–84a. Based on this experience, we believe Thomas would likely qualify as an expert witness qualified to render expert opinion testimony concerning the cause and extent of delays associated with a large scale construction project.

the State System's failure to appropriately address the issue, A.G. Cullen took responsibility to implement appropriate safety procedures. F.F. Nos. 49–52, 77. Notably, the Board found:

77. Since the contract did not include lead-based paint removal in the specifications, it did not make allowance for time required to plan, prepare for and execute appropriate lead-based paint abatement procedures, including taking safety precautions for workers. Although correspondence was initiated by the State System with A.G. Cullen in September, 2001, no progress was made in addressing the issue of lead-based paint abatement until A.G. Cullen took responsibility to implement appropriate safety procedures. (N.T. 398–399, 423–425, 489–490; Board Finding)

78. A.G. Cullen acted reasonably for the protection of its workers and others in the environment by stopping work from May 4 until June 4, 2001, a total of 31 days. (N.T. 394, 396, 423–425, 452; Board Finding)

79. A.G. Cullen resumed work only when it had appropriate protections in place to avoid any contamination by hazardous materials. (N.T. 465–466, 468–470; Plaintiff Ex. 89, 90; Board Finding)

80. The State System caused this 31-day delay as a result of the omission of lead-based paint abatement from the contract specifications and as a result of failing to address the matter despite its promise to do so in the Notice to Contractors. (Board Finding)

F.F. Nos. 77–80. Based on the Board's findings, we disagree the delay occasioned by implementation of the lead paint abatement program was caused by A.G. Cullen's failure to prepare a timely worker protection plan. To the contrary, the Board determined this delay was a direct result of the State System's omission of lead paint abatement from the contract specifications and its failure to address the matter despite its promise to do so in the notice to contractors. F.F. No. 80.

Nevertheless, the State System argues the Board erred in awarding delay-related damages for the 31–day period in which A.G. Cullen suspended work because A.G. Cullen did not prove this delay was solely attributable to the State System's conduct. Again, the Board's determinations belie this assertion.

Specifically, the Board determined, on May 4, 2001, A.G. Cullen stopped work on the window demolition portion of the project for the safety of its workers until it could implement a lead paint abatement program. F.F. No. 50. The Board further determined A.G. Cullen resumed work after approximately one month with systems in place to protect workers and others against hazardous material. F.F. No. 51. The Board determined the State System caused this suspension by failing to include provisions related to lead paint abatement work in the contract specifications and failing to subsequently address the issue despite a promise to do so in the notice to contractors. F.F. Nos. 80, 100, 101. Specifically, the Board stated:

The State System neglected to include specifications pertaining to lead-based paint abatement and failed to address the issue when it arose after construction had begun. As a result, window demolition work had to be halted while A.G. Cullen prepared and implemented a lead-based paint abatement plan.

F.F. No. 100. Ultimately, the Board determined, "[t]he period of delay attributable to lead-based paint abatement *and no other concurrent cause is the 31 day period ... when work was halted as a precaution against hazardous material.*" Concl. of Law. No. 23. Because the Board's find-

ings are supported by substantial evidence and those findings support the Board's conclusions, we will not disturb them.

### 4. Total Cost Method of Calculating Damages

The State System further argues the Board erred in utilizing the "total cost" method to calculate the delay-related damages it awarded to A.G. Cullen. It claims this method is inappropriate as the calculation of damages is too speculative.

 The total cost method for calculating damages involves the subtraction of the estimated costs set forth in the contract from actual costs. *E.C. Ernst, Inc.* This method is "inseparably connected with the rule that the amount of damages need not be ascertained with mathematical certainty to sustain an award in the [contractor's] favor." *John F. Harkins Co., Inc. v. Sch. Dist. of Phila.,* 313 Pa.Super. 425, 460 A.2d 260, 263 (1983) (quoting Rubin, "The Total Cost Method of Computing an Equitable Adjustment—An Analysis," 26 Fed. B.J. 303, 304 (1966)). It is premised on the fact that, where a contractor is entitled to an adjustment, a governmental body should not be exonerated merely because the contractor is unable to prove his increased costs with precision. *Harkins.*

 As a result, although the total cost method must be used with caution, *see Harkins,* this Court holds the method may be applied where the nature of the particular loss renders it impossible or highly impracticable to determine damages with a reasonable degree of accuracy and where the loss is substantiated by reliable evidence. *Glasgow, Inc. v. Dep't of Transp.,* 108 Pa.Cmwlth. 48, 529 A.2d 576 (Pa. Cmwlth.1987) (Board's use of total cost method proper where contractor presented extensive testimony concerning effect of delay and resulting costs); *Larry Arm-*

*bruster & Sons, Inc. v. State Pub. Sch. Bldg. Auth.,* 95 Pa.Cmwlth. 310, 505 A.2d 395 (1986) (upholding Board's use of total cost method based on testimony of contractor's representatives concerning delay and actual labor costs incurred). Mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of another's conduct. *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979); *Armbruster.*

 Here, the Board found Paul Cullen, Vice President of A.G. Cullen, testified "credibly and convincingly[ ] that A.G. Cullen's contemporaneously maintained cost records accurately reflected the costs incurred in separate categories of work on the John Sutton Hall project. (N.T. 1140, 1165–1166; Plaintiff Ex. 167, 168; Board Finding)." F.F. No. 114. The Board stated, "Cullen determined the extra cost ... attributable to the project delay *by determining the difference between the amount a delay category actually cost A.G. Cullen, and the amount budgeted to that category when the project was bid* .... (N.T. 1142–1143; Board Finding)." F.F. No. 116 (emphasis added). The Board found "the difference so calculated is a reasonable method of determining the cost of the total project delay to A.G. Cullen." *Id.*

Based on these findings, the Board determined:

A.G. Cullen has demonstrated that it incurred costs in specified categories of work as a result of the total project delay.... Paul Cullen[,] whose primary responsibility is to oversee all building projects, testified that A.G. Cullen recorded the costs incurred in fourteen categories that were affected by delays in the project. The contemporaneously prepared report detailed each transaction that occurred in the project and specified its cost. In order to demonstrate its damages for delay, A.G. Cullen

compared the costs actually incurred over the period of time that the project actually ran with the amount budgeted for the period that the project was supposed to run. The positive difference of these two totals equals a total amount that A.G. Cullen advances as its delay costs. The Board finds this a reasonably certain method for determining damages consistently with Pennsylvania law.

Bd. Op. at 43. We conclude the evidence presented by A.G. Cullen is sufficient to support the Board's award of damages pursuant to the "total cost" method. *Glasgow; Armbruster.* As such, we reject the State System's contention that the Board erred in utilizing this method to calculate the delay damages awarded.

### 5. "No Damages for Delay" Clause

As a final issue, the State System contends the Board erred in awarding delay-related damages in light of the "no damages for delay" clause in the contract.

The clause relied upon by the State System provides:

> No claims for increased costs, charges, expenses, or damages of any kind, except as provided in the [g]eneral [c]onditions, shall be made by the [c]ontractor against the [State] System for any delays or hindrances from any cause whatsoever, including but not limited to strikes, walkouts or work stoppages during the progress of any portion of the work. The [State] System may, however, compensate the [c]ontractor for any such delays by extending the time for completion of the work, as provided in the [c]ontract, which extensions shall constitute the exclusive remedy between the parties.

R.R. at 1051a.

■ With regard to the enforceability of this type of exculpatory clause, our Supreme Court holds:

The rule in Pennsylvania is that exculpatory provisions in a contract cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act in some essential matter necessary to the prosecution of the work. *Gasparini Excavating Co. v. Pennsylvania Turnpike Commission,* 409 Pa. 465, 187 A.2d 157 (1963), *See Commonwealth of Pennsylvania, State Highway and Bridge Authority v. General Asphalt Paving Company,* 46 Pa. Cmwlth. 114, 405 A.2d 1138 (1979). (In spite of contract provisions excluding claims for additional compensation due to delay caused by the owner, contractor awarded additional compensation for three month delay caused by Commonwealth's direct interference in failing to have a water main expeditiously relocated), and *Commonwealth of Pennsylvania, Department of Highways v. S.J. Groves and Sons Co.,* 20 Pa.Cmwlth. 526, 343 A.2d 72 (1975), (exculpatory provisions of contract held not to prevent recovery by contractor of increased costs in performing due to a fourteen week delay while AT & T relocated a coaxial conduit.) . . .

*Coatesville Contractors & Eng'rs, Inc. v. Borough of Ridley Park,* 509 Pa. 553, 560, 506 A.2d 862, 865–66 (1986).

■ Here, the Board determined the State System caused the 31–day delay during which A.G. Cullen suspended work by failing to include provisions for lead paint abatement in the contract specifications despite the fact it was aware of the existence of lead paint at the project site. In addition, the Board determined the State System failed to address the subject of lead paint despite its promise to do so in

the notice to contractors. Under these circumstances, the "no damage for delay" clause does not preclude A.G. Cullen's recovery. *Coatesville Contractors & Eng'rs, Inc.*

Accordingly, the order of the Board is reversed in part, and the case is remanded for an award to A.G. Cullen of attorney's fees associated with its claim for the lead paint abatement work. The Board's order is affirmed in all other respects.

### *ORDER*

AND NOW, this 15th day of March, 2006, the order of the Board of Claims is **AFFIRMED** in part and **REVERSED** and **REMANDED** in part. The order is **REVERSED** to the extent the Board of Claims failed to award A.G. Cullen Construction, Inc. attorney's fees on its claim for lead paint abatement work, and the case is **REMANDED** for calculation of an award of attorney's fees limited to the lead paint abatement claim. The Board of Claims order is **AFFIRMED** in all other respects.

Jurisdiction relinquished.

COLINS, President Judge, concurs in part, dissents in part, and files opinion.

CONCURRING AND DISSENTING OPINION BY President Judge COLINS.

I dissent. I cannot conclude, as does the majority, that the State System's conduct in this matter was vexatious within the intent of the statute. Therefore I must dissent from that portion of the majority opinion.

I join with the majority in their resolution of all the remaining issues.